**Rodney Joe FILLMORE, Plaintiff,**

v.

**KHP Trooper John EICHKORN, et al., Defendants.**

**No. 93–4211–RDR.**

United States District Court, D. Kansas.

May 18, 1995.

Rodney Joe Fillmore, pro se.

David C. Wetzler, Bennett, Lytle, Wetzler, Martin & Pishny, L.C., Prairie Village, KS, Carol R. Bonebrake, John W. Campbell, Office of Atty. Gen., Topeka, KS, for defendants John Eichkorn, Karl J. Koenig, K.H.P. Troopers.

David C. Wetzler, Bennett, Lytle, Wetzler, Martin and Pishny, L.C., Prairie Village, KS, Carol R. Bonebrake, John W. Campbell, Office of Atty. Gen., Sandra L. Jacquot, Office of County Counselor, Shawnee County, Kan., Topeka, KS, for defendants Damon L. Carlton, K.H.P. Trooper, Athena E. Andaya, Shawnee County Asst. Dist. Atty.

Catherine A. Walter, Thomas E. Wright, Wright, Henson, Somers, Sebelius, Clark & Baker, Sandra L. Jacquot, Office of County Counsel, Shawnee County, Kan., Topeka, KS, for defendants Earl Hindman, Shawnee Co. D.O.C. Director, John Does, Shawnee Co. D.O.C. Correctional Officers John Does 1–8, Jane Roes, Shawnee Co. D.O.C. Correctional Officers Jane Roes 1–6, Shawnee Co. D.O.C. Correctional Officers Does or Roes unknown, Scott Greeno, Rhonda Redmon, Richard Hamilton, Todd Rogers, Timothy James, Brian Cole, Kenneth Akins, David Seymour, Merrill McCue, Kenneth Sloop, Tammy Reedy, Thomas (NMI) Merkel.

## MEMORANDUM AND ORDER

ROGERS, Senior District Judge.

This is an action under 42 U.S.C. § 1983 with pendent state law claims. Plaintiff is suing three Kansas Highway Patrol ("KHP") troopers who participated in plaintiff's arrest

on September 25, 1992. These defendants are: Trooper John Eichkorn; Trooper Karl Koenig; and Trooper Damon Carlton. Plaintiff is also suing many correctional officers and officials of the Shawnee County Department of Corrections ("SCDOC") in connection with plaintiff's detention following his arrest. These defendants are: Scott Greeno; Richard Hamilton; Todd Rogers; Timothy James; Brian Cole; Kenneth Akins; David Seymour; Merrill McCue; Kenneth Sloop; Tammy Reedy; Rhonda Redmon; Earl Hindman and Thomas Merkel.[1] Defendants Hindman and Merkel are sued in their official capacities. The other SCDOC defendants are sued in their individual capacities.

This case is now before the court upon three motions for summary judgment. Plaintiff has filed a motion for summary judgment. The defendant troopers have filed a motion for summary judgment. The SCDOC defendants have also filed a motion for summary judgment. The court has considered all three motions and the materials submitted in support of the motions. After full consideration, the court believes summary judgment should be granted against plaintiff's federal law claims, and the court should decline to exercise supplemental jurisdiction over plaintiff's state law claims.

*Plaintiff's Claims*

Plaintiff's complaint makes the following claims against the defendant KHP troopers: unlawful seizure of plaintiff in violation of the Fourth and Fourteenth Amendments; unlawful arrest in violation of the Fourth and Fourteenth Amendments; unlawful retalia-

---

1. Two people who apparently left employment with SCDOC after the events in question but before plaintiff filed this lawsuit, Tom Rork and Shannon Ridgeway, have also been identified as defendants. There is a controversy concerning whether Tom Rork and Shannon Ridgeway have been properly served with plaintiff's complaint or have been represented by counsel in this lawsuit. Counsel for the other SCDOC defendants disclaim any representation of Tom Rork and Shannon Ridgeway because they did not work for SCDOC when counsel filed an answer for the other SCDOC defendants. Plaintiff argues that the answer counsel filed for the other SCDOC defendants covered Rork and Ridgeway as well. We find that no answer was filed on behalf of Rork and Ridgeway and that Rork and Ridgeway

have not been timely served with process in this case. Counsel filed the answer on behalf of the SCDOC officers plaintiff identified as John Does and Jane Roes in his original complaint. Doc. No. 7. Plaintiff stated in the complaint that the John Does and Jane Roes "are" employees of Shawnee County. Doc. No. 1. Since Rork and Ridgeway were not employees of SCDOC when the answer was filed, counsel did not file the answer on their behalf. There is no indication in the record that Rork and Ridgeway have been served with process. Plaintiff has been on notice of this problem for a considerable time through discussions with the U.S. Magistrate Judge. But, service has not been completed. Therefore, Rork and Ridgeway shall be dismissed pursuant to FED.R.CIV.P. 4(m).

tion or punishment for exercising plaintiff's right to silence in violation of the Fourteenth Amendment; unlawful search in violation of Section 15 of the Bill of Rights of the Kansas Constitution; unlawful seizure in violation of Section 15 of the Bill of Rights of the Kansas Constitution; and malicious prosecution.

Plaintiff's complaint claims that defendant SCDOC officers and officials unlawfully punished him in violation of the Fourteenth Amendment in the following manner: by confining plaintiff in a detox cell when he was not intoxicated; denying plaintiff toilet paper and toilet facilities; denying plaintiff's requests for distilled water to drink and 100% cotton clothing to wear in accordance with plaintiff's religious beliefs; using excessive force to disrobe plaintiff; denying plaintiff a Holy Bible; denying plaintiff writing material; denying plaintiff the right to make a telephone call; denying plaintiff a chair, mattress, blanket or pillow; denying plaintiff's request for a psychological counselor; confining plaintiff in cells with the lights left on at full intensity day and night; confining plaintiff in cells with television surveillance; ogling plaintiff while he was naked in his cell; and maintaining plaintiff's confinement for more than 48 hours without a probable cause hearing. Plaintiff further claims that several of the above-described actions violated his right to privacy, his rights under the First Amendment, state statute, and Section 15 of the Bill of Rights of the Kansas Constitution.

*Procedural Standards*

Plaintiff has brought this case *pro se*. Accordingly, the court has not strictly applied the standards of practice against his pleadings. See *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.1991). This does not excuse plaintiff, who is not a novice at litigation, from the burden of coming forward with evidence to support his claims as required by the Federal Rules of Civil Procedure and the local rules of this court. *Dees v. Vendel*, 856 F.Supp. 1531, 1536 (D.Kan.1994) citing *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir.1988); Local Rule 206 (material facts deemed admitted

unless specifically controverted). In assessing the factual support for plaintiff's claims, the court has considered all the material supplied for all three summary judgment motions, including the affidavits filed by plaintiff.[2]

The general guidelines for analyzing summary judgment motions were reviewed by the Tenth Circuit in *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993):

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 91 L.Ed.2d 202, 106 S.Ct. 2505, 2509 (1986); *Russillo v. Scarborough*, 935 F.2d 1167, 1170 (10th Cir.1991). The moving party bears the initial burden of showing that there is an absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L.Ed.2d 265, 106 S.Ct. 2548, 2552 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 89 L.Ed.2d 538, 106 S.Ct. 1348, 1355–56 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). To sustain this burden, the non-moving party cannot rest on the mere allegations in the pleadings. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Applied Genetics Int'l v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990).

*Plaintiff's Claims against KHP Troopers Eichkorn, Carlton & Koenig*

The following uncontroverted facts are pertinent to these claims. On the evening of

---

**2.** The court has also attempted to consider plaintiff's claims in light of plaintiff's motion to amend the complaint (Doc. No. 65), which was permitted to be filed out of time and granted (Doc. No. 94). Unfortunately, plaintiff did not file a first amended complaint.

September 25, 1992, Trooper Eichkorn was on duty and stopped a pickup truck which plaintiff was driving on U.S. Highway 75 south of Topeka, Kansas. Eichkorn's duties included enforcing the traffic and vehicle laws of the State of Kansas. In the course of these duties, Trooper Eichkorn and other troopers have frequently stopped vehicles with defective taillights. Prior to the evening of September 25, 1992, Trooper Eichkorn had never met plaintiff and did not know plaintiff.

After stopping his pickup truck, plaintiff exited the vehicle and approached Eichkorn to ask why he had been stopped. Eichkorn radioed for assistance, and Troopers Karl Koenig and Damon Carlton arrived shortly thereafter. Eichkorn told plaintiff that he was stopped because of a defective right taillight. A piece of the taillight lens was missing. Plaintiff denied that the taillight was unlawful. Eichkorn also noted that the driver's side mirror on plaintiff's truck was defective because it was cracked, although he did not indicate plaintiff was stopped because of the cracked mirror. Plaintiff denied that the mirror was unlawful and demanded permission to leave. Eichkorn asked plaintiff to identify himself and for his driver's license. Plaintiff refused. This happened repeatedly. Plaintiff does not dispute that he was aggressive, belligerent, argumentative and uncooperative with Eichkorn.

Eichkorn arrested plaintiff for: obstruction of legal process, failure to produce a driver's license, and no proof of insurance. Following the arrest, plaintiff's truck was subjected to an inventory search. Plaintiff's wallet was found during the course of the search. The wallet and its contents were taken to the Shawnee County jail. The wallet contained identification cards or other cards which did not use plaintiff's name. At the jail, Eichkorn learned plaintiff's identity after officers from Osage County, Kansas, who overheard radio traffic, called SCDOC and suggested that the person Eichkorn arrested was Rodney Joe Fillmore. Eichkorn conducted a computer check using plaintiff's name through the State of Virginia. The check showed that plaintiff's driver's license was suspended. Eichkorn wrote plaintiff three notices to appear for: driving with a suspended license in violation of K.S.A. 8–262; no proof of insurance in violation of K.S.A. 40–3104; and obstruction of legal process in violation of K.S.A. 21–3808. Eichkorn also issued an inspection warning for a defective right taillight and defective left mirror.[3]

Plaintiff was charged in Shawnee County District Court in a three-count complaint with: obstructing legal process in violation of K.S.A. 21–3808; no liability insurance in violation of K.S.A. 40–3104; and driving while suspended in violation of K.S.A. 8–262. At trial, all three charges were dismissed by the presiding judge.

### Unlawful Seizure

Plaintiff contends that he was unlawfully seized by Trooper Eichkorn when the trooper stopped plaintiff's vehicle on September 25, 1992. Plaintiff asserts that he was not guilty of any traffic violation and that Trooper Eichkorn merely wanted to pull plaintiff over to check plaintiff's paperwork or to perform some other search. We believe summary judgment must be granted against this claim.

■ " 'Reasonable suspicion' of illegal conduct is the proper standard to justify stopping a car for a routine traffic violation." *U.S. v. Horn*, 970 F.2d 728, 731 (10th Cir. 1992). "Absent introduction of any rationale for the stop outside the parameters of the traffic violations, the stop cannot, by definition, be called 'pretextual.' " *Id.*

■ At trial, plaintiff would have the burden of proving a Fourth Amendment violation. However, there is no proof in the record that the stop in this case was pretextual. Plaintiff has offered no evidence of any rationale for the stop other than what defendants have stated. Accordingly, a reasonable

---

**3.** Plaintiff disputes this. But, the court believes any reasonable jury, after viewing the documents, would conclude that these warnings were issued on September 25, 1992 as the documents reflect, rather than fabricated on a later date for the purposes of litigation, as plaintiff alleges.

jury could not determine that the stop was pretextual.[4]

Plaintiff could still prevail with sufficient proof that the stop was not justified by reasonable suspicion of illegal conduct. Plaintiff argues that reasonable suspicion did not exist in this case because the alleged defective taillight did not violate any Kansas statute. There is no dispute that a piece of the lens was missing from the taillight. The missing piece of the lens came from the side of the right taillight. Trooper Eichkorn testified at plaintiff's trial that the taillight "showed white [light] to the rear." Plaintiff has stated in an affidavit that the taillight "did not show white to the rear in any appreciable or easily discernible amount."[5] Under Kansas law, K.S.A. 8-1759a, highway patrol troopers are authorized to stop vehicles upon reasonable cause "to believe that a vehicle is unsafe or not equipped as required by law, or that its equipment is not in proper adjustment or repair." Counsel for the defendant troopers contend that this statute authorized Eichkorn's stop of plaintiff's truck. Despite the break in the taillight, plaintiff contends that the taillight emitted a red light plainly visible from a distance of one thousand feet as required by K.S.A. 8-1706.[6] The court accepts this point. Because the taillight allegedly complied with the statutory requirements for taillights, plaintiff argues that Trooper Eichkorn did not have reasonable suspicion that his pickup truck was unsafe or that the equipment was not in proper repair.

■ There are no Kansas cases directly on point which we can find. There is a split of authority in cases from other states. Compare *State v. Reed*, 107 Idaho 162, 165, 686 P.2d 842, 845 (App.1984) ("An officer who observes a white light on the rear of a forward-moving vehicle reasonably could suspect a defective tail lamp and would be entitled briefly to detain the vehicle for further inquiry.") and *Enzor v. State*, 262 Ark. 545, 559 S.W.2d 148, 149-50 (1977) (legal basis existed under statute similar to K.S.A. 8-1759a for stopping vehicle for malfunction of taillight assembly even though the taillight was not totally inoperative and a traffic citation was not warranted or intended) with *Doctor v. State*, 596 So.2d 442, 446-47 (Fla. 1992) (officers involved in drug interdiction program made a pretextual stop for a defective taillight because an automobile with a cracked lens cover on a taillight does not

---

**4.** The holding in *U.S. v. Horn, supra,* provides some support for this conclusion. In *Horn,* a criminal case which arose from Utah, the trooper stopped the defendant's vehicle because it did not have a front license plate and because the driver did not appear to be wearing a seatbelt, although the seatbelt requirement under Utah law could not independently justify stopping a car. After stopping the car, the trooper noticed that the car was licensed in Oklahoma, which does not require a front license plate. The defendant argued in a motion to suppress that his Fourth Amendment rights had been violated because the traffic stop was pretextual. The denial of the motion to suppress was affirmed because no alternative rationale for the stop was offered and sufficient evidence was present to support the officer's suspicion of a traffic violation.

**5.** Plaintiff submitted a videotape of the truck with his motion for summary judgment. Given the dusky light conditions, the angle of the camera, and the speed of the truck in combination with the camera's difficulty in focusing on a moving object, it is impossible to tell whether white light was emitted from the taillight. Overall, the videotape is not competent evidence of the amount of white light emitted from the taillight.

**6.** K.S.A. 8-1706 provides:

(a) Every motor vehicle, trailer, semitrailer and pole trailer, and any other vehicle which is being drawn at the end of a combination of vehicles, shall be equipped with at least two (2) tail lamps mounted on the rear, which, when lighted as required in K.S.A. 8-1703, shall emit a red light plainly visible from a distance of one thousand (1,000) feet to the rear, except that passenger cars manufactured or assembled prior to July 1, 1959, shall have at least one (1) tail lamp. On a combination of vehicles, only the tail lamps on the rearmost vehicle need actually be seen from the distance specified. On vehicles equipped with more than one (1) tail lamp, the lamps shall be mounted on the same level and as widely spaced laterally as practicable.

(b) Every tail lamp upon every vehicle shall be located at a height of not more than seventy-two (72) inches nor less than fifteen (15) inches.

(c) Either a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of fifty (50) feet to the rear. Any tail lamp or tail lamps, together with any separate lamp or lamps for illuminating the rear registration plate, shall be so wired as to be lighted whenever the head lamps or auxiliary driving lamps are lighted.

violate statutes similar to K.S.A. 8–1706 and K.S.A. 8–1759a) and *Vicknair v. State,* 751 S.W.2d 180 (Tex.Cr.App.1986) (when taillight emitted red light visible to the officer, there was no reason to stop car for a defective taillight even though fracture in taillight lens allowed some white light to be emitted with the red light).

Rather than attempt to decide this unsettled point of Kansas law, the court believes plaintiff's claim should be resolved under the doctrine of qualified immunity. The Tenth Circuit summarized the structure for applying the doctrine of qualified immunity in *Guffey v. Wyatt,* 18 F.3d 869, 871 (10th Cir. 1994):

> As our jurisprudence makes clear, when a defendant raises qualified immunity, the burden shifts to the plaintiff to establish the defendant violated clearly established constitutional rights. *Hannula v. City of Lakewood,* 907 F.2d 129, 130–31 (10th Cir. 1990). Further, the Supreme Court mandates a plaintiff do more than simply allege abstract violations. Instead, a plaintiff is charged with making a particularized showing: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Finally, a plaintiff has to "demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Hannula,* 907 F.2d at 131.
>
> . . . .
>
> Once the plaintiff satisfies his burden, the defendant must then show "no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and the information the defendant possessed at the time of his actions." *Salmon v. Schwarz,* 948 F.2d 1131, 1136 (10th Cir.1991) (citations omitted).

It should be remembered that "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) quoting, *Malley v. Briggs,* 475 U.S. 335, 343, 341, 106 S.Ct. 1092, 1097, 1096, 89 L.Ed.2d 271 (1986).

■ In the case at bar, the court believes defendants have demonstrated that no material issues of fact bar the conclusion that a reasonable officer in defendant Eichkorn's position could have believed he had reasonable suspicion of a traffic violation which justified stopping plaintiff's truck. "In determining whether reasonable suspicion exists, [a court] consider[s] the totality of the circumstances to see if the officers have a 'minimal level of objective justification,' something more than an 'inchoate and unparticularized suspicion or hunch.' " *U.S. v. Moore,* 22 F.3d 241, 243 (10th Cir.) *cert. denied,* —— U.S. ——, 115 S.Ct. 238, 130 L.Ed.2d 161 (1994) quoting, *United States v. Hall,* 978 F.2d 616, 620 (10th Cir.1992). Defendant Eichkorn had objective evidence of a broken taillight. There are no Kansas cases interpreting the statutes in question which hold that a taillight emitting white light does not violate K.S.A. 8–1706 or K.S.A. 8–1759a. There are cases from other states which find that adequate grounds to make a stop do exist under such circumstances. Accordingly, the court believes a reasonable officer in defendant Eichkorn's position could have believed he had an objective justification for stopping plaintiff's truck. Therefore, defendant Eichkorn is entitled to qualified immunity from liability.

■ One might argue against qualified immunity on the grounds that plaintiff could not have been successfully prosecuted for violating the taillight statute, K.S.A. 8–1706, and that Eichkorn did not issue a ticket for violating K.S.A. 8–1759a, which more generally requires keeping a vehicle in proper repair and adjustment. However, reliance upon the wrong statutory provision is not fatal to a qualified immunity claim. *Wachtler v. County of Herkimer,* 35 F.3d 77, 80 (2d Cir.1994). The court believes it is indisputable that a reasonable officer had objective grounds to believe there was illegal conduct which justified making the stop. Therefore, the court rejects this argument.

*Unlawful Arrest/Retaliation*

■ Plaintiff claims that the defendant troopers violated his constitutional rights because they arrested him without probable cause to believe he violated the law. In their summary judgment motion, defendants argue that at the time of plaintiff's arrest, defendants had probable cause to believe plaintiff was driving without a license on his person (in violation of K.S.A. 8–244) or driving without having been issued a driver's license (in violation of K.S.A. 8–235(a)). Of course, it is uncontroverted that plaintiff repeatedly refused Trooper Eichkorn's request to show a driver's license.

Plaintiff has not responded specifically to this argument. Instead, plaintiff refers back to his claim that the initial stop was illegal. In a previous case with similar facts involving plaintiff, summary judgment was granted against plaintiff's unlawful arrest claim. *Fillmore v. Ordonez*, 829 F.Supp. 1544, 1556–58 (D.Kan.1993) *aff'd on other grds*, 17 F.3d 1436 (10th Cir.1994) (table case, opinion attached hereto). We will follow this holding and grant summary judgment against plaintiff's unlawful arrest claim. We further note that the Tenth Circuit has held that "there is no clearly established right under the Fifth Amendment, to ignore police requests at the scene of an investigation for a witness's name and address." *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1026 (10th Cir.1994). On this basis, we believe the defendant troopers are entitled to summary judgment against plaintiff's false arrest/retaliation claim on the basis of qualified immunity.

*Plaintiff's Claims against the SCDOC Defendants*

The following facts, which are uncontroverted or accepted for plaintiff's benefit in analyzing defendants' motions, are pertinent to plaintiff's claims against the SCDOC defendants. Plaintiff was brought to SCDOC by Trooper Eichkorn at approximately 9:15 p.m. on September 25, 1992. Trooper Eichkorn signed an arrest report charging plaintiff with three misdemeanors. The normal book-in procedures of SCDOC call for obtaining identification information, medical information, and dietary information. Fingerprints and photographs are taken under normal procedures. Plaintiff refused to provide his name or any identification information to the book-in officers. Plaintiff immediately demanded several things including: permission to call an attorney; toilet paper; distilled water to drink; a copy of the Holy Bible; pencil and paper; a telephone call; and a chair, mattress, pillow and blanket.

Defendant McCue explained to plaintiff that he could be booked in and booked out very quickly. Plaintiff understood the book-in procedures. Because plaintiff refused to provide identification information and other medical and psychological information, he was placed in Cell B–8. Cell B–8 is a detox cell equipped with a camera for surveillance. The cell has padded walls and a padded floor. There is a drain in the floor for defecation and urination. While plaintiff was roomed there, the lights were dimmed during portions of the night. Cell B–8 is used to temporarily house persons considered as a potential threat to themselves or otherwise warranting close observation.

Plaintiff asserts that defendants supplied him with only a 12–inch strip of toilet paper and three to four ounces of tap water. Plaintiff further claims that he was told he would remain in the detox cell until he provided the information necessary for the book-in procedure. At 4:05 a.m. on September 26, 1992, defendant Rogers told plaintiff he would not be removed from Cell B–8 until his erratic behavior stabilized. Plaintiff denies that he acted erratically. Plaintiff continued to refuse to submit to book-in procedures.

Plaintiff was moved to Cell B–6 at 5:10 a.m. on September 26, 1992, according to defendants, or at a later time after breakfast, according to plaintiff. An inmate checklist used to monitor inmates indicates that plaintiff was in Cell B–6 at 6:40 a.m. on September 26, 1992. Cell B–6 is equipped with a bed, mattress, toilet and sink. There is no surveillance camera. Plaintiff was permitted to use the telephone at approximately 10:30 a.m. on September 26, 1992. He called his mother. Plaintiff was then provided a pen and paper. He used the writing materials to make a list of dietary requirements and a list of demands. At 2:40 p.m. plaintiff received a visit from Candi Fillmore.

Persons who do not bond out of SCDOC are not permitted to wear their own clothing. Plaintiff repeatedly refused to undress because, although his religion does not prohibit him from undressing, it allows him to wear only cotton. SCDOC did not have any all-cotton jump suits. Defendant Akins called for help with the dress-in procedure. Defendants Cole and Hamilton arrived to assist defendant Akins. When plaintiff continued to refuse to disrobe, defendants Akins, Cole and Hamilton made efforts to force plaintiff to undress. Plaintiff physically resisted having his clothes removed by tightly crossing his arms across his body and crossing his legs. After some minutes passed, defendant Seymour arrived to assist the other officers. He grabbed plaintiff's right arm and used a technique called an "arm bar." Plaintiff's limbs were forcibly straightened and his clothing was removed. After that, plaintiff put on his jail-issued undershorts and T-shirt. However, he refused to wear the jump suit. The dress-in procedure lasted approximately 15 minutes. Defendant Seymour estimated that his role in the process lasted five minutes. Plaintiff's clothes were not torn or damaged in the process.

In his complaint, plaintiff alleged that he suffered "extreme pain" in his lower back for two days and in his right arm for two weeks. In his response to the SCDOC defendants' motion for summary judgment, plaintiff alleges that of the four officers who forcibly disrobed him, only defendant Seymour used excessive force by intentionally trying to injure plaintiff's right arm. The defendants who disrobed plaintiff stated that there were no injuries suffered by plaintiff or defendants. After he was released from SCDOC, plaintiff did not require or seek medical treatment for any injury suffered during the dress-in procedure. However, plaintiff avers that he requested psychological counseling while he was detained at SCDOC and that this request was denied.

Plaintiff asserts that defendants James and Cole told him that he was being treated severely because he refused to cooperate with the book-in procedure. Plaintiff attributes similar statements to defendants Greeno, Hamilton, Reedy and Rogers.

Plaintiff was assigned to Cell CT-1 at approximately 4:30 p.m. on September 26, 1992. Cell CT-1 has a surveillance camera, a toilet, a sink, a bench and a mattress. The lights were not dimmed at night. After plaintiff learned that his undershorts were not 100% cotton, he removed them. At times he covered himself with a towel. Other times, he remained naked from the waist down. A blanket was available to use as cover. Plaintiff asserts that one time defendant Redmon, without warning, opened a viewing window and "ogled" plaintiff.

In the early morning hours of September 28, 1992, defendant McCue responded to a call by plaintiff. Plaintiff indicated that he had been at SCDOC for approximately 51 hours and had not yet seen a judge, in violation of the Supreme Court's 48-hour rule in *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Under this rule, a probable cause determination by a judicial authority must follow within 48 hours of a warrantless arrest absent a bona fide emergency or other extraordinary circumstances. *Id.* at 56–57, 111 S.Ct. at 1669–1670. Plaintiff demanded to be presented to a magistrate or else released. Defendant McCue told plaintiff that his case had probably been reviewed by the Duty District Attorney and the Duty Court Case Judge. This was an assumption by defendant McCue, but it appears in accord with the SCDOC's procedures for complying with the 48-hour rule. Plaintiff asserts that defendant McCue told him there was a policy of ignoring the 48-hour rule if it required making a magistrate come in on a weekend or holiday.

So that pretrial detainees received a probable cause determination within 48 hours of their detention, procedures were instituted whereby every Sunday morning the District Attorney "on call" for that weekend would contact SCDOC to determine the status of detainees by requesting information kept on an arraignment sheet. As a result of the District Attorney's review, the District Attorney would then either submit an affidavit upon which to obtain a warrant or make a determination to release the individual. If the District Attorney determined that the

individual should be released, a written release would be delivered to the jail sometime on Sunday. If the District Attorney decided to obtain a warrant, and was successful, the warrant would be delivered to the jail on Monday morning. Defendant Merkel, who has been the Deputy Director of SCDOC since 1984, is unaware of any other detainee who has remained in jail in excess of 48 hours without a warrant being issued through the District Attorney. Defendant Merkel was unaware of plaintiff's detention vis-a-vis the 48-hour rule. Nor was he aware of anyone at the policy or administrative level of SCDOC with such knowledge. The lack of action by the District Attorney's office was not discovered until the paperwork for plaintiff's first appearance was reviewed.

At 8:22 a.m. on September 28, 1992, plaintiff was taken for his first appearance. He was advised that he could be released after executing an OR bond. Plaintiff arranged for the bond and was released at approximately 2:40 p.m. on September 28, 1992. Upon his release, plaintiff received all of his property in defendants' custody. The property had not been damaged. Plaintiff did not attempt to contact an attorney following his release.

*Conditions of Confinement*

Plaintiff asserts that his placement in a detoxification cell, where plaintiff did not have a chair, mattress, sink, toilet, blanket, pillow, writing materials, or a sufficient amount of toilet paper, violated his Fourteenth Amendment due process rights. The Fourteenth Amendment affords protection against punishment without due process. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Plaintiff asserts that he was being punished because of his refusal to cooperate with the book-in procedures initially by his placement in the detoxification cell. Defendants deny that plaintiff was being punished. Instead, defendants argue that plaintiff's refusal to supply basic personal and medical information led them to place plaintiff under conditions where he could be monitored to determine whether he was a danger to himself or anyone else. After several hours of monitoring, plaintiff was placed in a cell with more amenities. Defen-

dants claim they were reacting logically to plaintiff's eccentric and erratic behavior. Defendants also argue that they are entitled to qualified immunity from liability.

In *Bell v. Wolfish, supra,* the Court provided the following guidance for deciding what is unconstitutional punishment of a pretrial detainee:

A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. See *Flemming v. Nestor,* [363 U.S. 603,] 613–617 [80 S.Ct. 1367, 1374–1376, 4 L.Ed.2d 1435] (1960). Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Kennedy v. Mendoza-Martinez,* [372 U.S. 144,] 168–169 [83 S.Ct. 554, 567–568, 9 L.Ed.2d 644] (1963); see *Flemming v. Nestor, supra,* 363 U.S. at 617, 80 S.Ct. at 1376. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees. See *ibid.* Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility. Cf. *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2048–49, 52 L.Ed.2d 752 (1977); *United States v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973).

. . . .

Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they

are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial. We need not here attempt to detail the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention. It is enough simply to recognize that in addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment.

441 U.S. at 538–40, 99 S.Ct. at 1873–75.

Time can play a significant part in a court's analysis of these issues. *Id.* at 543, 99 S.Ct. at 1876; see also, *Block v. Rutherford,* 468 U.S. 576, 587, 104 S.Ct. 3227, 3233, 82 L.Ed.2d 438 (1984) (mentioning brevity of detention while sustaining prohibition on contact visits for pretrial detainees); *Hutto v. Finney,* 437 U.S. 678, 686–87, 98 S.Ct. 2565, 2571–72, 57 L.Ed.2d 522 (1978) ("A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks and months.").

■ Plaintiff in an affidavit has alleged statements by defendants which are evidence of an "expressed intent to punish." However, given the limited time which plaintiff spent in the detoxification cell and the conditions of the cell, the court does not believe the Constitution's protections against punishment without due process are implicated. "There is . . . a *de minimus* level of imposition with which the Constitution is not concerned." *Bell v. Wolfish, supra,* 441 U.S. at 539 n. 21, 99 S.Ct. at 1874 n. 21, quoting *Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977); see *Heard v. Sheahan,* 1995 WL 86746 (N.D.Ill. 1995) (copy attached) * (requiring detainee to sleep on floor in response to overcrowding is not punishment and does not violate constitutional rights); *Isaac v. Fairman,* 1994 WL 63219 (N.D.Ill.1994) (copy attached) * (detainee who was required to sleep on bed roll on cold floor with bugs and vermin for one week does not have a constitutional claim);

*Gilland v. Owens,* 718 F.Supp. 665, 685 (W.D.Tenn.1989) (short term denial of hygienic items, including toilet paper, and mattresses is not a constitutional violation); see also, *Harris v. Fleming,* 839 F.2d 1232, 1234–35 (7th Cir.1988) (denial of hygienic items, including toilet paper, for five days does not violate Eighth Amendment rights of a convicted prisoner).

Plaintiff asserts that other aspects of his detention violated his rights under the Fourteenth Amendment or other parts of the Constitution. Again, because of the brief time period involved, the court does not believe the conditions and actions alleged by plaintiff justify constitutional scrutiny. Therefore, we find there was no constitutional violation by reason of any limitations placed upon plaintiff's access to the telephone and writing materials after he was removed from the detox cell. Similarly, defendants' denial of plaintiff's request for a Holy Bible, distilled water and 100% cotton clothing over a weekend does not reach constitutional status under due process or religious freedom perspectives. See *Van Cleave v. United States,* 1987 WL 44401, 1987 U.S.Dist. LEXIS 13101 (S.D.Tex.1987) (copy attached) * (denial of a Bible which pretrial detainee could read did not make a constitutional claim). Nor does leaving the lights on in Cell CT–1 over the time span in question and keeping plaintiff under camera surveillance have constitutional significance. See *Fillmore v. Ordonez, supra,* 829 F.Supp. at 1568.

■ Plaintiff's claim that a female correctional officer "ogled" his genitals when one time, according to plaintiff, she "suddenly without knocking or warning opened the viewing window" of plaintiff's cell, also is not constitutionally significant. See *Cookish v. Powell,* 945 F.2d 441, 447 (1st Cir.1991); *Thompson v. Wyandotte County Detention,* 869 F.Supp. 893 (D.Kan.1994) (and cases cited therein); *Arey v. Robinson,* 819 F.Supp. 478, 486 (D.Md.1992).

■ Similarly, the denial of plaintiff's request to see a psychological counselor during his detention is not of constitutional magnitude. There is no evidence that plaintiff's distress was so significant or substantial that the failure to provide a psychological counsel-

* Editors Note: Deleted for purposes of publication.

or amounted to the punishment of plaintiff without due process. See *Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10th Cir.1992) (summary judgment affirmed where pretrial detainee's claim of inadequate medical attention is not supported by significantly probative evidence of a serious medical need).

### Excessive Force

Plaintiff asserts that defendant Seymour used excessive force and purposely inflicted injury upon plaintiff's right arm when he helped forcibly disrobe plaintiff. Once again, we view this claim under the standards of *Bell v. Wolfish, supra*, and assess under summary judgment standards the evidence of whether a legitimate government interest was involved and whether defendant Seymour attempted to punish plaintiff or acted with a level of force unnecessary to further a legitimate government interest. See *Telfair v. Gilberg*, 868 F.Supp. 1396 (S.D.Ga.1994) (discussing the standards which should apply to an excessive force claim by a pretrial detainee).

 First, we note that plaintiff has not asserted competent evidence of an express intent to punish on the part of defendant Seymour. So, we next consider whether a legitimate government interest was promoted by his actions and those of the other defendants. The court believes the requirement that detainees not be permitted to wear their own clothing serves a legitimate interest and that defendants were justified in enforcing this requirement. The court also believes that the force applied was necessary to further SCDOC's legitimate interest. Plaintiff repeatedly refused to undress himself. He physically resisted the efforts of three SCDOC officers to undress him. For five minutes, defendant Seymour assisted defendants Akins, Cole and Hamilton in their efforts to completely disrobe plaintiff. Seymour's assistance involved grabbing plaintiff's right arm, and using an "arm-bar" technique. No further force was used after

plaintiff was undressed. Plaintiff's injury was not significant. There is no evidence or assertion that plaintiff sought or required medical treatment after he was released from SCDOC. A nurse was sent to plaintiff's cell, but apparently no treatment was given.[7] Nor is there evidence of bleeding, bruising, swelling or disfiguration.[8] Accordingly, we do not believe plaintiff suffered "punishment" without due process by reason of defendant Seymour's actions or the actions of the other defendants participating in the dress-in process. See *Fillmore v. Ordonez, supra*, 829 F.Supp. at 1569–70.

### Qualified Immunity

 Even if there were adequate grounds for a reasonable jury to find a constitutional violation by reason of the conditions of confinement or the use of force, the court believes the defendant officers would be entitled to qualified immunity from any damages award. The law was not clearly established at the time of plaintiff's incarceration that the conditions of confinement or forceful actions of the SCDOC officers violated the Constitution of the United States.

### 48–Hour Rule/Qualified Immunity

 Similarly, the court believes qualified immunity protects defendants from liability for the violation of plaintiff's rights under the Fourth Amendment. In cases involving alleged Fourth Amendment violations, the Supreme Court has instructed that the doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Liability is premised upon what a "reasonably well-trained officer" would know. *Id.* at 345, 106 S.Ct. at 1098. The development of the law must be such "that a reasonable official would understand that what he is doing violates" the law. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97

---

7. Plaintiff asserts in his pleadings, but not in an affidavit, that he asked for an ice pack and ointment from the nurse but did not receive them. It is not clear whether the ice pack was for plaintiff's back or his arm. Plaintiff has not made a claim of inadequate medical care or indifference to medical needs, other than his claim concerning the denial of psychological counseling.

8. Plaintiff states in his response to the SCDOC defendants' summary judgment motion that his skin was "lacerated." However, this statement is not substantiated by plaintiff's affidavits or his verified complaint. Nor is the severity of the laceration described.

L.Ed.2d 523 (1987). The Court recognized that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Id.* at 641, 107 S.Ct. at 3039–40.

In the case at bar, the uncontroverted facts demonstrate that while defendants were aware of the 48–hour rule, they reasonably but mistakenly concluded that a warrant had been received for plaintiff's arrest and, therefore, that the requirements of the rule had been followed. This conclusion was reasonable because the procedures in effect required the District Attorney to obtain an arrest warrant over the weekend or order the release of the detainee. Since plaintiff's release was not ordered by the District Attorney and notification of warrants authorized on Sunday was not usually received until Monday, defendants could reasonably conclude that the 48–hour rule had been followed. Defendants' procedures did not call for detainees to be presented to a magistrate on weekends or holidays. But, this does not mean defendants ignored the 48–hour rule, as plaintiff contends. The 48–hour rule does not require that the arrested person be present during the probable cause determination. *Garcia v. City of Chicago*, 24 F.3d 966, 969 (7th Cir.1994) *cert. denied,* —— U.S. ——, 115 S.Ct. 1313, 131 L.Ed.2d 194 (1995); *Fiscus v. City of Roswell,* 832 F.Supp. 1558, 1563 (N.D.Ga.1993). Thus, defendants were not required to honor plaintiff's demand to be presented to a magistrate or else released.

In sum, it was reasonable for defendants to believe that the District Attorney had completed the process of obtaining an arrest warrant for plaintiff before the expiration of 48 hours, when under routine practice for persons arrested on a Friday night, SCDOC would receive notice from the District Attorney to release a detainee on Sunday or notice of the warrant on Monday. In this case, no notice to release was received from the District Attorney on Sunday, September 27, 1992. Therefore, a reasonably trained officer at SCDOC could assume that an arrest warrant had been obtained for plaintiff.

Plaintiff has argued that defendants Hindman and Merkel are liable in their official capacities.[9] "[A] judgment against a public servant in his or her official capacity imposes liability on the entity he or she represents ... an official capacity suit is simply another way of pleading an action against that entity." *Hinton v. City of Elwood,* 997 F.2d 774, 783 (10th Cir.1993) (citations omitted). Of course, the doctrine of qualified immunity does not protect defendants sued in their official capacities. See *Medina v. City and County of Denver,* 960 F.2d 1493, 1499–1500 (10th Cir.1992) (a finding of qualified immunity does not shelter a municipality from liability).

To establish the liability of Shawnee County, plaintiff must show 1) the existence of a county policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged. *Hinton v. City of Elwood, supra,* 997 F.2d at 782, citing *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1202–03, 103 L.Ed.2d 412 (1989). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), unless proof of the incident includes proof that it was caused by an existing, unconstitutional ... policy ..." *Butler v. City of Norman,* 992 F.2d 1053, 1055 (10th Cir.1993).

9. Although plaintiff has stated that he is suing defendants Hindman and Merkel only in their official capacities, plaintiff's complaint also alleges a failure to train by defendants Hindman and Merkel. However, in response to defendants' motion for summary judgment, plaintiff has not attempted to argue that defendants Hindman and Merkel are liable in their individual capacities for a failure to train. Plaintiff has focused entirely upon their responsibility for SCDOC's policy regarding the 48–hour rule. In addition, there does not appear to be any evidence of an affirmative link between the actions or omissions of defendants Hindman and Merkel and the alleged violations of § 1983. Finally, as explained earlier, the court does not believe plaintiff's claims regarding conditions of confinement and excessive force pass constitutional muster. Therefore, if, contrary to plaintiff's statements, plaintiff intended to sue defendants Merkel and Hindman in their individual capacities, summary judgment shall be granted against those claims.

■ The record does not indicate a county policy or custom of violating the 48–hour rule. Instead, the policy was to comply with the rule. The evidence before the court shows that the county policy and procedure was not followed in plaintiff's case because of the failure of the District Attorney to either seek an arrest warrant or order plaintiff to be released. In this case, the policy did not cause the violation of the 48–hour rule. Rather, the deviation from the policy by someone who is not a defendant caused plaintiff's extended incarceration without a probable cause finding by a judicial authority. Therefore, the court shall grant summary judgment against plaintiff's official capacity claims against defendants Hindman and Merkel.[10]

Finally, the court acknowledges plaintiff's citation to *Hallstrom v. City of Garden City*, 991 F.2d 1473 (9th Cir.) *cert. denied,* —— U.S. ——, 114 S.Ct. 549, 126 L.Ed.2d 450 (1993), where detention for 79 hours prior to a magistrate's hearing was held to be a violation of plaintiff's Fourth Amendment rights. In *Hallstrom,* detention in violation of the 48–hour rule was done intentionally to coerce compliance with book-in procedures. In the instant case, defendants reasonably believed the 48–hour rule had been followed. Moreover, contrary to the facts in *Hallstrom,* the violation of the rule in the case at bar was not in accordance with, but in deviation from, the policy of SCDOC.

*Supplemental Jurisdiction*

State law claims remain against the defendants. Since summary judgment shall be granted on the federal claims before trial, the court does not believe it would be unfair or inconvenient to the parties to require plaintiff to pursue his state law claims in state court. Furthermore, these claims raise novel and potentially complex issues of state law. Therefore, the court shall not retain jurisdiction over plaintiff's state law claims and shall dismiss those claims without prejudice in accordance with 28 U.S.C. § 1367(c).

*Conclusion*

In conclusion, the court shall grant defendants' motions for summary judgment against plaintiff's federal claims. The court shall dismiss defendants Rork and Ridgeway pursuant to FED.R.CIV.P. 4(m). The court shall deny plaintiff's motion for summary judgment as to plaintiff's federal claims. The court declines to retain supplemental jurisdiction over plaintiff's state law claims. These claims shall be dismissed without prejudice.

**IT IS SO ORDERED.**

Appendix

NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.

(The decision of the Court is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter.)

Rodney Joe FILLMORE, Plaintiff-Appellant,

v.

Miguel ORDONEZ, Osage County Sheriff; Eldon Croucher, Osage County Deputy Sheriff; Gerald Nitcher, Osage County Deputy Sheriff; Lori Dunn, Osage County Deputy Sheriff; Ken Fozdick, Osage County Deputy Sheriff, Defendants-Appellees.

No. 93–3272.

United States Court of Appeals, Tenth Circuit.

---

10. Once again, plaintiff's arguments in response to the SCDOC defendants' summary judgment motion are focused on the 48–hour rule as opposed to some other aspect of SCDOC policy which may have caused one or more of plaintiff's alleged injuries. Plaintiff has not responded specifically to defendants' arguments alleging no evidence of a policy, practice or custom to violate pretrial detainees' First Amendment rights or rights against the use of excessive force. The record does not establish such a policy, practice or custom. Therefore, summary judgment also shall be granted against these claims.

March 1, 1994.

## ORDER AND JUDGMENT [FN1]

Before MOORE, ANDERSON and KELLY, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The cause is therefore ordered submitted without oral argument.

Rodney Joe Fillmore brought this pro se action under 42 U.S.C. § 1983, seeking monetary damages against the Osage County Sheriff Miguel Ordonez and five deputy sheriffs for alleged violations of his First, Fourth, Sixth, Eighth and Fourteenth Amendment rights. The parties filed cross motions for summary judgment, and the district court granted summary judgment to the defendants on all counts. Fillmore appeals, contending that: 1) the district court improperly found that he was arrested for failure to display a license; 2) the arresting officer did not have probable cause to arrest; 3) failure to display a license is not an arrestable offense; 4) the arrest was an unlawful retaliation for the exercise of a constitutional right; 5) the search of his truck cab and the seizure of items on the seat violated his Fourth Amendment rights; 6) his prosecution for obstructing the legal process was malicious; 7) he was denied access to legal materials; 8) the denial of his religious diet was punishment; 9) the jail conditions violated his constitutional rights; and 10) he was unconstitutionally subjected to pain when he was dressed and returned from the hospital in a squad car. We affirm.

## BACKGROUND

The district court's opinion completely details the background. *Fillmore v. Ordonez,* 829 F.Supp. 1544, 1550–54 (D.Kan.1993). On the night of December 7, 1991, Fillmore was stopped for speeding by Osage County Deputy Sheriff Eldon Croucher, who had known him since childhood. In response to Croucher's request for his driver's license, Fillmore responded he did not have one. After a radio check disclosed no Kansas license in Fillmore's name, Croucher asked Fillmore if he had a license from another state and if it was suspended. Fillmore refused to answer, stating that he would not admit to a crime. Croucher advised Fillmore that he needed the information to fill out the citation, that Fillmore was obstructing the duty of an officer. Croucher then arrested Fillmore for obstructing official duty and failing to display his license. Incident to the arrest, after handcuffing and placing Fillmore in the patrol car, Croucher removed a briefcase and money bag from the seat of Fillmore's truck and then locked the vehicle.

At the jail, Officers Nitcher and Manning were on weekend duty. Fillmore refused to be photographed or fingerprinted without a warrant or to answer questions necessary to fill out the booking information sheets. When Nitcher and Manning indicated that the fingerprinting requirement was statutory, Fillmore continued his refusal, noting that the referenced statute did not apply to him. He also refused to put on the standard jail uniform because his religion forbids his wearing clothing made of mixed fibers.

As a result of his conduct, the Osage County Attorney[2] charged Fillmore with two counts of obstructing the legal process under Kan.Stat.Ann. 21–3808 (one for failing to cooperate with Croucher and one for failing to cooperate with Nitcher and Manning during the booking procedures), one count of failing to display his license under Kan.Stat.Ann. 8–244, one count of driving while suspended under Kan.Stat.Ann. 8–262(a) (based on information received from the State of Virginia that his license there had been suspended),

---

1. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470.

2. The county attorney was originally named as a party defendant. The claims against her were dismissed without prejudice.

and one count of speeding under Kan.Stat. Ann. 8–1336.

At booking, Fillmore demanded a special religious diet which prohibited, among other things, meat with fat, pasteurized milk, margarine, white bread, and tap water. On Monday, December 9, Sheriff Ordonez came on duty along with Officer Dunn, the head jailer. That afternoon Officer Fozdick came on duty. On December 10, Fillmore delivered several formal, written, administrative demands which repeated his dietary demands and added demands for a softer mattress, legal books, a switch to turn off the security light and beeper in his jail cell, and the opportunity to examine his jail file. His demands were granted to the extent that resources were available.

On Monday morning, December 9, 1991, Fillmore was taken to court for his arraignment. The judge offered to release him on his own recognizance and a $500.00 appearance bond. Fillmore refused to sign the bond, stating his religion forbids his pledging unjust weights and balances, and he was returned to jail. Later that day, he offered to sign a bond pledging gold, which the judge refused.

On the evening of December 11, Fillmore fell while stepping out of the shower in his cell. Complaining of serious injury, he was taken by ambulance to the hospital of his choice. Once there, he refused pain medication and blood or urine tests because of religious prohibitions. The examining doctor found no significant injury, declined to admit Fillmore, and advised Officers Dunn and Fozdick that return transport by police car was fine. Fozdick and a male nurse assisted Fillmore in getting dressed while Fillmore complained of continued pain, and Fozdick drove him back to the jail. Upon return to his cell, Fillmore sat up most of the night, working on his legal papers.

The court appointed counsel for Fillmore on December 11. On December 12, five days following his arrest, a bond for cash or equivalent property was approved, and Fillmore was released. On December 17, Fillmore filed a motion to dismiss appointed counsel, noting that he was an experienced pro se litigator.

On January 21, 1992, Fillmore was tried with his previously appointed counsel acting as standby. The court dismissed the two obstruction counts on Fillmore's motion. It also dismissed the driving while suspended charge on the county attorney's motion, since documentation from Virginia had not arrived. The court convicted Fillmore of failing to display a license and speeding. Fillmore appealed. While the appeal was pending, he brought this action. His convictions were upheld by the Kansas Court of Appeals, and the Kansas Supreme Court denied Fillmore's petition for review.[3]

## DISCUSSION

"[I]n order to recover in federal court through 1983 a plaintiff must show: (1) a federal constitutional right was violated; and (2) the individual violating the constitutional right did so under color of law. The civil rights law is not a general tool to discipline local law enforcement officers." *Quezada v. County of Bernalillo,* 944 F.2d 710, 714 (10th Cir.1991) (citations omitted). The district court granted summary judgment for the defendants on each of Fillmore's claims, finding either no constitutional violation or qualified immunity as a matter of law.

We review a summary judgment de novo, applying the same standard as the trial court. *Abercrombie v. City of Catoosa,* 896 F.2d 1228, 1230 (10th Cir.1990). Summary judgment is proper when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We review the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Abercrombie,* 896 F.2d at 1230. However, the mere allegation of some factual dispute will not defeat an otherwise properly supported motion for summary judgment, and a mere scintilla of evidence does not create a genuine issue of material fact. *Anderson v.*

---

**3.** *State v. Fillmore,* No. 92–68,086–A [849 P.2d 150] (Kan.Ct.App. March 19, 1993) (unpublished opinion), *rev. denied* (Kan. May 7, 1993); R. Vol. III, Tab 84.

*Liberty Lobby, Inc.,* 477 U.S. 242, 256 [106 S.Ct. 2505, 2514, 91 L.Ed.2d 202] (1986). The inquiry is "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Id.* at 252 [106 S.Ct. at 2511] (quoting *Improvement Co. v. Munson,* 14 Wall. 442, 448 [20 L.Ed. 867] (1872)). With respect to those issues for which he carries the burden of proof, the nonmoving party must produce specific facts "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves" if a properly supported summary judgment motion is to be avoided. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 [106 S.Ct. 2548, 2553, 91 L.Ed.2d 265] (1986).

A pro se litigant's pleadings are to be construed liberally. *Haines v. Kerner,* 404 U.S. 519, 520 [92 S.Ct. 594, 595–96, 30 L.Ed.2d 652] (1972). However, the trial court does not assume the role of advocate for the pro se litigant and need not accept his conclusory allegations. *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991).

Fillmore's first four assignments of error concern his arrest. As the district court noted, lack of probable cause is an essential element of a 1983 claim for unlawful arrest.[4] *Karr v. Smith,* 774 F.2d 1029, 1031 (10th Cir.1985). Under Kansas law, Fillmore's Kansas court conviction for the offense of failing to display a license conclusively establishes probable cause for the arrest. "[A] judgment of conviction amounts to a conclusive determination that probable cause for the arrest … existed (absent any showing of perjury, fraud or corruption in obtaining the judgment).… Therefore, when the petition shows … a judgment of conviction, it fails to allege a cause of action for … unlawful arrest.…" *Hill v. Day,* [168 Kan. 604], 215 P.2d 219, 223–24 (1950). Pursuant to 28 U.S.C. [§] 1738, federal courts must "give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Franklin v. Thompson,* 981 F.2d 1168, 1170 (10th Cir.1992) (quoting *Allen v. McCurry,* 449 U.S. 90, 96 [101 S.Ct. 411, 415–16, 66 L.Ed.2d 308] (1980)). Since he has made no showing that his conviction was improperly obtained, Fillmore is barred from claiming his arrest was unlawful under 1983.

In his fifth assignment of error, Fillmore contends it was error to grant summary judgment on the issue of illegal search and seizure.[5] For the first time on appeal, Fillmore seeks a remedy under provisions of Kansas law that may grant greater protection than that afforded under the rule of *New York v. Belton,* 453 U.S. 454, 460 [101 S.Ct. 2860, 2864, 69 L.Ed.2d 768] (1981). We do not hear arguments not urged in the trial court. *Cannon v. City and County of Denver,* 998 F.2d 867, 878 (10th Cir.1993).

Fillmore's sixth contention is that the district court should not have granted summary judgment to Ordonez, Nitcher, and Manning on the claim of malicious prosecution for obstructing legal process. The district court held that there was no showing that the officers acted maliciously, and the officers' participation in the prosecution did not rise to the egregious level required to support a 1983 claim. Since its ruling, we have received new guidance from *Albright v. Oliver* [—— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114] (1994). Albright holds that the Fourteenth Amendment does not create a substantive due process right to be free from criminal prosecution except upon probable cause. Rather, a majority of the concurring justices held the constitutional right to be free from baseless criminal prosecution is determined under the Fourth Amendment. Like the petitioner in Albright, Fillmore has

---

**4.** In upholding the validity of the arrest, the district court ruled that probable cause existed as a matter of law based on the undisputed facts before it. We affirm that ruling, relying on other grounds which are supported by the record. *Griess v. Colorado,* 841 F.2d 1042, 1047 (10th Cir.1988).

**5.** The district court upheld the search and seizure on the basis of qualified immunity. On the record before us, we find the seizure constitutionally permissible as incident to the arrest. *New York v. Belton,* 453 U.S. 454, 460 [101 S.Ct. 2860, 2864, 69 L.Ed.2d 768] (1981); *United States v. Franco,* 981 F.2d 470, 472–73 (10th Cir.1992); *United States v. Cotton,* 751 F.2d 1146, 1149 (10th Cir.1985).

pled this constitutional deprivation under the Fourteenth and Fifth amendments, neither of which are applicable, so his claim must fail. To the extent Fillmore claims substantive due process violations, he must look to state law for his remedy.

As his seventh claim of error, Fillmore asserts he was denied access to legal materials. The jail log indicates that Fillmore first made his demand for legal materials at 1:45 p.m. on December 10, and these were immediately provided to the extent available at the jail. R. Vol. V, Exhibits, Dunn Ex. 1, log dated 12–10–91; R. Vol. IV, Ordonez Dep. at 52–53. The next morning, on December 11, the court appointed counsel for Fillmore, who came to visit him at jail at 9:40 a.m. R. Vol. II, Tab. 69, Dunn Ex. 1, log dated 12–11–91. We hold that Fillmore was given adequate access to the courts and legal materials as required by *Love v. Summit County*, 776 F.2d 908, 912 (10th Cir.1985), *cert. denied*, 479 U.S. 814 [107 S.Ct. 66, 93 L.Ed.2d 25] (1986).

Fillmore's eighth claim is that the denial of a special diet required by his religion violated his First and Eighth Amendment rights. As the district court noted, a pretrial detainee cannot invoke the Eighth Amendment's prohibition which applies only to those convicted of a crime. See *Meade v. Grubbs*, 841 F.2d 1512, 1519 n. 4 (10th Cir.1988) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 [99 S.Ct. 1861, 1872–73 n. 16, 60 L.Ed.2d 447] (1979)). As a pretrial detainee, Fillmore was entitled to be protected from punishment, based upon a due process standard. *Bell*, 441 U.S. at 535 n. 16 [99 S.Ct. at 1872–73 n. 16]. Religious practices can be limited by legitimate penological interests. See *Turner v. Safley*, 482 U.S. 78, 89 [107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64] (1987). Brevity of detention may be considered in assessing the restriction. See *Block v. Rutherford*, 468 U.S. 576, 587 [104 S.Ct. 3227, 3233, 82 L.Ed.2d 438] (1984). Safety is a legitimate penological interest. *Clifton v. Craig*, 924 F.2d 182, 184 (10th Cir.) *cert. denied* [502 U.S. 827], 112 S.Ct. 97 [116 L.Ed.2d 68] (1991). Fillmore's deposition reveals that at all times he was able to consume some portions of the food

and beverages brought to him, including eggs, whole wheat bread, vegetables, fruits and fruit juices. R. Vol. IV, Fillmore Dep. at 143–44, 148. Although his family brought additional food for him, jail policy prohibits such outside food because of health, sanitary and inspection requirements. Dunn's deposition indicates that the jailers attempted to comply with Fillmore's dietary demands to the extent they could, and that she called the Kansas Department of Corrections for guidance. R. Vol. IV, Dunn Dep. at 6, 38. The jail log shows that Fillmore was given distilled water on the morning of December 10. R. Vol. V, Exhibits, Dunn Ex. 1, log dated 12–10–91. Within twenty-four hours of his formal administrative demand, all food and beverages comported with his religious requirements. R. Vol. IV, Fillmore Dep. at 142. We hold that the short delay in providing a diet in full compliance with Fillmore's religious requirements did not rise to the level of a constitutional deprivation.

As his ninth assignment, Fillmore contends that the jail conditions violated his constitutional rights. We agree with the district court that Fillmore's complaints about his mattress were "de minimis," and the security beeper and light were reasonably related to maintaining internal security. As to his being placed in the holding/detox cell for the first night of his incarceration, we agree that the only defendant against whom this claim is made, Sheriff Ordonez, has no liability, since he was not at the jail at the time and did not participate in the decision to place Fillmore in the holding cell. There is no affirmative link between Ordonez and that event, and the doctrine of respondeat superior does not apply under 1983. *Ware v. Unified School Dist. No. 492*, 902 F.2d 815, 819 (10th Cir.1990). Although Fillmore correctly cites Kansas law which makes the sheriff liable for the acts of his jailers, supervisory liability under 1983 requires an affirmative showing of some custom, regulation or policy which warranted, encouraged or permitted the wrongful act. *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir.1993).

Finally, the tenth claim of error concerns the pain Fillmore allegedly suffered when Fozdick dressed him at the hospital and re-

turned him to the jail in the squad car. The record shows that the treating physician advised that returning Fillmore by car was acceptable. R. Vol. IV, Dunn Dep. at 25. Fillmore testified that a male nurse assisted Fozdick in getting him dressed. R. Vol. IV, Fillmore Dep. at 268–71. At all times Fozdick followed the advice of, and was assisted by, appropriate medical personnel. We agree with the district court that his acts were reasonably related to the legitimate government objective of returning Fillmore safely and securely to jail and do not amount to "punishment." See *Bell v. Wolfish*, 441 U.S. at 538–39 [99 S.Ct. at 1873–74].

Accordingly, the judgment of the district court is AFFIRMED.