Sandra Folse WATSON,
et al., Plaintiff,

v.

CITY OF KANSAS CITY, KANSAS,
et al., Defendant.

No. Civ.A. 99–2106–KHV.

United States District Court,
D. Kansas.

Nov. 8, 1999.

Mark K. Birmingham, Kansas City, KS, for Plaintiffs.

Douglas M. Greenwald, Daniel B. Denk, Gregory P. Goheen, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for Defendants.

## MEMORANDUM AND ORDER

VRATIL and MURGUIA, District Judges.

This matter comes before the Court on *Defendants' Motion To Dismiss Plaintiffs'* *Amended Petition For Damages* (Doc. # 29) filed July 1, 1999, pursuant to Fed. R.Civ.P. 12(b)(6). For reasons stated below, defendants' motion is sustained in part and denied in part.

## Motions To Dismiss Under Rule 12(b)(6)

In ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must assume as true all well pleaded facts in plaintiffs' complaint and view them in a light most favorable to plaintiffs. *Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *see also Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984). The Court must make all reasonable inferences in favor of plaintiffs. *Zinermon,* 494 U.S. at 118, 110 S.Ct. 975; *see also* Fed.R.Civ.P. 8(a); *Lafoy v. HMO Colorado,* 988 F.2d 97, 98 (10th Cir.1993). The issue in reviewing the sufficiency of plaintiffs' complaint is not whether they will prevail, but whether they are entitled to offer evidence to support their claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court may not dismiss a cause of action for failure to state a claim unless it appears beyond a doubt that plaintiffs can prove no set of facts in support of their theory of recovery that would entitle them to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence,* 927 F.2d 1111, 1115 (10th Cir.1991). Although plaintiffs need not precisely state each element of their claims, they must plead minimal factual allegations on those material elements that must be proved. *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991).

## Facts[1]

Sandra Watson owns properties at 1209 through 1221 Central Avenue and 1216

---

1. In *Plaintiffs [sic] Response To Defendants' Motion To Dismiss Plaintiffs' Amended Petition For Damages And Memorandum In Opposition Of Defendants' Motion To Dismiss* (Doc. # 37) filed July 21, 1999, plaintiffs include various factual allegations that are not contained in their complaint. On a motion to dismiss, the Court does not consider allegations outside of the pleadings, however, and

through 1220 Ridge Avenue in Kansas City, Kansas. Steve Perry is property manager for Watson's properties at 1209 through 1221 Central Avenue and he rented space from Watson to operate a business. Christine Perry is Steve Perry's wife. William Bushue also rented business space from Watson. Carla Balzer, Christy Knight, Christy Anthony, Ronald Beachman and Dora Huff were residential tenants at the time of the incidents in question.

On March 24, 1995, a fire burned Watson's properties at 1215 Central Avenue and 1219 Central Avenue. Plaintiffs allege that since the fire, defendants have attempted to close these properties and destroy the businesses of Watson, Bushue and Perry. Plaintiffs also allege that defendants have attempted to close the residential properties and deny all other plaintiffs their fundamental rights to choose where they live.

In the early morning of July 10, 1997, defendants planned and conducted a warrantless search of the Central Avenue properties which Watson rented to Balzer, Knight, Anthony, Beachman and Huff. At approximately 9:00 a.m., Steve Perry advised Watson that seven to ten uniformed officers or employees of various municipal departments of Kansas City, Kansas were searching, trespassing, and attempting to gain entry into the premises. Pat Ohler, director of the Neighborhood Resource Center and a lieutenant with the Kansas City, Kansas police department, demanded entry into the common hallways of residential apartments located at 1211–1217 Central Avenue to check the halls and around the outside.[2] Steve Perry inquired whether Ohler had a search warrant. Defendants answered that they did not, but the group continued to search the outside of the properties. Perry informed Ohler and the other defendants that he did not have authority to allow anyone other than a resident to enter the buildings.

Early the next morning, at approximately 8:15 a.m. on July 11, 1997, Watson and Steve Perry arrived at 1209–1221 Central Avenue, where they observed seven to ten uniformed officers or employees of various municipal departments conducting another warrantless search of the outside of the properties. When Watson got out of her car, someone shoved a camcorder into her face while Edwin A. Rust, acting fire marshal for Kansas City, Kansas, demanded entry into the residential addresses of 1211–1217 Central Avenue and the nonresidential properties at 1219–1221 Central Avenue. Watson refused entry and advised the group that she would have to speak to her lawyer before discussing anything further. Watson then departed.

Steve Perry and Christine Perry were in the process of purchasing from Watson property at 1220 Ridge Avenue. This property was contiguous to Watson's property at 1209–1221 Central Avenue. Steve Perry discovered that during the warrantless search on July 11, 1997, Rust, Ohler, Debbie Ward, an employee with the Code Enforcement Department of the Unified Government, and other city employees had opened the gate to his property at 1220 Ridge Ave, Kansas City, Kansas, ignored his "no trespassing" sign, and entered his property. Defendants also videotaped his home and tomato garden.

Also on July 11, 1997, Rust, Maurice Ryan, an assistant city attorney, and Gregory Talkin, deputy chief building inspector for the Building Inspections Department of the Unified Government, conspired to obtain a search warrant for Watson's properties at 1211–1219 Central Avenue and 1221 Central Avenue. Rust, Ryan and Talkin drafted or offered input into an affidavit in support of the application for search warrant and located a Wyandotte County district judge to hear the application. In both the affidavit and sworn testimony before the court, Rust gave false and

the Court's statement of facts therefore is limited to the allegations of the complaint.

**2.** The complaint does not allege why Ohler demanded permission to check outside, or whether the buildings are separate or connected, apartments or duplexes.

misleading information. In the application for a search warrant, Rust stated that he had observed "what appeared to be a violation of fire code." Rust omitted material facts, including the fact that a valid repair permit existed for 1215 Central Avenue and 1219 Central Avenue. In the application, Ryan sought a warrant allowing "an inspection ... to determine whether or not such ordinances have been violated." At a subsequent hearing, Ryan stated that city ordinance allowed the application for a warrant because plaintiffs had refused to allow entrance into the properties. Ryan stated that a right of entry requires that a demand for entry be made to those in control, but defendants did not demand entry to any tenant during either of the two previous warrantless searches. Defendants received a search warrant which listed the addresses of the properties, but did not contain the names of the owner, the names of any tenants, or the apartment numbers.

Watson was ordered to be present at 1209–1221 Central Avenue at 4:30 p.m. on July 11, 1997 for execution of the search warrant. When she arrived, Rust served her with the warrant. Ohler seized Watson's building at 1215 Central by ordering that only Watson and Steve Perry could enter the building and by placing police guards at the building entrance. Plaintiffs overheard these officers tell another officer that they were there to close down the buildings. Ohler, Rust, Talkin, Ward and Wayne Bradley, building inspector I for the Building Inspections Department for the Unified Government, took city employees on an extensive three-hour search of the buildings. Rust and Ohler went into every apartment and space in the buildings. Plaintiffs allege that the search far exceeded the scope of the affidavit for a search warrant, the sworn testimony, and the warrant itself. Defendants went to each address, threatened tenants, and investigated tenants' private refrigerators, bathrooms and cabinets. Defendants

forced entry into sealed basement areas, broke a window to gain entry into an occupied apartment while the tenant was at work, and generally terrorized the tenants and frightened their small children.

On July 24, 1997, Rust and Ohler sent Watson a letter which listed several code violations and demanded that Watson meet certain requirements. The majority of the alleged code violations were fabrications, while the remaining violations were minor and located in areas outside of Watson's control. The letter directed Watson to hire an engineer and an architect to give the city a report and plans on the buildings, even though a Wyandotte County district court had previously held that Watson did not need to do so. The letter also gave Watson notice that she would have to secure building permits, even though she already had a building permit.[3]

A month later, on August 29, 1997 at approximately 9:30 a.m., Ohler and other city employees arrived at the properties and without notice to Watson, tagged the buildings as "unfit" and notified tenants that they would have to vacate the premises. The notice set a hearing date of September 8, 1997 at 9:00 a.m. On September 2, 1997, John Lacy, license administrator for the Unified Government, sent Watson a letter which terminated her rental license for the buildings on Central Avenue even though Watson had paid her fees and had no inspection.

On September 8, 1997, at 9:00 a.m., Watson and her tenants appeared at City Hall for the hearing as provided in the prior notice. No one was present to conduct a hearing.

On October 8, 1997, city attorney Wes Griffin requested entry to reinspect the properties at 1211–1221 Central Avenue from J.R. Russell, attorney for Watson. Russell denied the request. Ohler, Rust and Ryan applied for and obtained a second search warrant for reinspection of the same properties, which again failed to list the name of the owner, the names of any

---

**3.** In a letter dated July 21, 1997, the city informed Watson that her building permit was revoked. The city did not mail the letter, however, until August 28, 1997.

tenants, or any apartment numbers. Rust, Ohler and Ryan attached their July 24, 1997 report in the affidavit and application for search warrant.

Defendants executed the search warrant at approximately 1:50 p.m. on October 9, 1997. Ohler and Rust demanded entry from Steve Perry, but refused to let him read the search warrant in its entirety. Steve Perry went to his home and called Russell, who advised Perry that he did not have authority to surrender the keys to anyone. Ohler and Steve Williams, an officer with the Kansas City, Kansas police Department, went to Steve Perry's home and threatened to take him to jail if he did not turn over the keys to all of the property addresses. Ohler agreed to let Steve Perry read the search warrant but when Perry emerged from his home, Ohler ordered Williams to handcuff him. Ohler also informed Steve Perry that he had no rights. Ohler and Williams then handcuffed Steve Perry and confined him in a police vehicle. Christine Perry, extremely upset over this turn of events, ran back to the Perry home, retrieved the keys for the rental properties and gave them to defendants. Ohler and Williams then gave Steve Perry a ticket to appear in court. Despite this ticket, Kansas City did not have court on the date recited on the ticket, did not notify Steve Perry's attorney of any other court date, and did not refile or prosecute charges against Steve Perry.

When defendants arrived at Watson's properties, they knew that Steve Perry was repairing a water leak but they refused to let him shut off the water to prevent damage to the properties. During the course of defendants' search, they broke the main lock at 1215 Central Avenue, threw around and damaged items in storage, and called the gas company because of an alleged gas leak which the gas company could not find. Defendants made disparaging remarks about plaintiffs and Russell. Defendants again forced all tenants to endure another general search of the premises.

Defendants brought criminal charges against Watson based upon her actions with the rental properties. A Wyandotte County district court quashed the July 11 search warrant and suppressed the evidence against Watson. On March 15, 1999, the city dismissed the criminal case against Watson.

Based upon the July 10 search, Watson, Bushue, Perry, Balzer, Knight and Beachman bring claims against Ohler and all defendants who entered the properties.[4] They allege (1) unreasonable search and seizure in violation of the Fourth Amendment of the United States Constitution and Article 15 of the Kansas Bill of Rights, (2) trespass and (3) intentional infliction of emotional distress.

Regarding the warrantless search on July 11, the same plaintiffs and Christine Perry bring identical claims against Ohler, Rust, Ward and all other defendants who entered the properties. Watson, Bushue, Steven Perry, Balzer, Knight and Beachman also sue Rust, Ryan, Talkin, Bradley and Ward and all others involved in obtaining and executing the July 11 search under the warrant. They allege (1) unreasonable search and seizure; (2) denial of due process as provided by the Fifth and Fourteenth Amendments to the United States Constitution; (3) invasion of privacy in violation of the First, Fourth and Fourteenth Amendments and state tort law; (4) conspiracy to commit trespass; (5) trespass; (6) tortious interference with existing contractual relations; and (7) invasion of privacy by false light.[5] Based on the search, Watson, Bushue and Perry also

---

4. Plaintiffs bring 29 claims against specified defendants. In addition, they claim that the municipal defendants who created the policies which allowed the unlawful conduct are liable on all 29 claims.

5. The complaint lists Christine Perry as a plaintiff on the false light claim, but it then excludes her from its list of plaintiffs injured in this claim. *See Amended Petition For Damages* (Doc. # 24) at 23. In addition, plaintiffs bring their false light claim under Section

claim tortious interference with prospective business advantage against the same defendants.

Based on the eviction, revocation of building permit and rental license, and lack of a hearing, Watson, Bushue, Perry, Balzer, Knight and Beachman allege that Lacy, Graber, Talkin, Ohler, Rust and all others involved deprived plaintiffs of their right to substantive due process and equal protection under the Kansas and United States Constitutions.[6]

Based on the October 9 search, Watson, Bushue, Perry, Balzer, Knight, Anthony and Huff have sued Rust, Ohler, Talkin, Bradley and others. They allege (1) unreasonable search and seizure, (2) deprivation of due process, (3) trespass, (4) outrage, (5) invasion of privacy,[7] (6) invasion of privacy by false light and (7) tortious interference with existing contractual relations.[8] Watson, Bushue and Perry also bring claims of tortious interference with prospective business advantage against the same defendants. Steve Perry brings a claim of false arrest against Marinovich, Ohler, Williams and all others who entered the properties on October 9.

Based on defendants' entire course of conduct, Watson, Bushue, Perry, Balzer, Christine Perry, Knight, Anthony, Beachman and Huff claim abuse of process by all defendants.

Defendants have filed a motion to dismiss, arguing that (1) many of plaintiffs' federal claims fail to state a claim for relief, (2) defendants are entitled to qualified immunity on all of plaintiffs' federal claims under 42 U.S.C. § 1983, and (3) defendants' conduct falls within exceptions

to the waiver of sovereign immunity provided by the Kansas Tort Claims Act, K.S.A. § 75–6101 *et seq.* ("KTCA").

## Analysis

### 1. Prior Litigation

Defendants first argue that plaintiffs' claims are barred by claim preclusion because Watson and Bushue previously settled another case with Marinovich and dismissed the prior claims with prejudice. Both parties submit evidence regarding the scope of the prior claims and settlement agreement. It is well established that

> [a] motion to dismiss for failure to state a claim upon which relief can be granted must be converted into a motion for summary judgment whenever the district court considers matters outside the pleadings. Fed.R.Civ.P. 12(b)(6). As Defendants recognize, courts have broad discretion in determining whether or not to accept materials beyond the pleadings. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 (1990). Reversible error may occur, however, if the district court considers matters outside the pleadings but fails to convert the motion to dismiss into a motion for summary judgment. *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir.1991).

*Lowe v. Town of Fairland*, 143 F.3d 1378, 1381 (10th Cir.1998). Neither party contends that the Court should convert the motion into one for summary judgment, and the Court therefore refuses to consider matters outside of the pleadings at this time.

---

**6.** Plaintiffs do not identify any specific portion of either Constitution which provides them these rights. *See Amended Petition For Damages* (Doc. # 24) at 27. The Court assumes that plaintiffs bring their claims under the Fourteenth Amendment of the United States Constitution and Sections 1 and 2 of the Bill of Rights to the Kansas Constitution.

1983, but fail to identify any constitutional right which defendants allegedly violated by their invasion of privacy. *Id.* at 23–24.

**7.** Unlike their previous invasion of privacy claim, plaintiffs do not allege any constitutional right to privacy for this claim and apparently rely solely upon state tort law. *See Amended Petition For Damages* (Doc. # 24) at 32.

**8.** While plaintiffs title this claim "Tortious Interference With Prospective Business Advantage," plaintiffs' factual allegations list the claim as interference with existing contractual relations. *See Amended Petition For Damages* (Doc. # 24) at 34.

Even if the Court were to consider the additional evidence, the Court is highly doubtful that claim preclusion would bar the present litigation. First, the present litigation does not appear to arise out of the same wrong as the previous case, which involved an anti-drug march in 1996, as opposed to property searches by city employees in 1997. *See Parsons Mobile Prods., Inc. v. Remmert,* 216 Kan. 138, 140, 531 P.2d 435, 437 (1975) (plaintiffs must litigate all claims arising out of single wrong); *Oxbow Energy, Inc. v. Koch Indus., Inc.,* 686 F.Supp. 278, 282 (D.Kan. 1988) (all claims arising out of single wrong must be prosecuted in one action). While plaintiffs allege a general pattern of conduct connecting the actions, the specific claims in each case do not arise out of the same set of facts. *Griffith v. Stout Remodeling, Inc.,* 219 Kan. 408, 413, 548 P.2d 1238, 1243 (1976). Moreover, because few parties are the same or in privity with the parties from the prior litigation, claim preclusion probably would not dispose of the entire case. Only Watson and Bushue were plaintiffs in the prior litigation, and Marinovich is the only defendant common to each case. The Court sees little reason to suspect that the other parties in this case controlled the prior litigation or had a proprietary or financial interest in the outcome. *See Phelps v. Hamilton,* 122 F.3d 1309, 1319 (10th Cir.1997). The Court therefore turns to defendants' remaining arguments.

## 2. Qualified Immunity

 The individual defendants argue that they are entitled to qualified immunity on plaintiffs' Section 1983 claims. "Government officials performing discretionary functions generally are shielded from lia-

bility for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity provides government officials immunity from suit as well as from liability for their discretionary acts. *See Mitchell v. Forsyth,* 472 U.S. 511, 526–27, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio,* 847 F.2d 642, 644 (10th Cir.1988); *see also Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993). The doctrine of qualified immunity serves the goals of "protecting officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

 "Where a qualified immunity defense is asserted in a 12(b)(6) motion ... we apply a heightened pleading standard, requiring the complaint to contain 'specific, non-conclusory allegations of fact sufficient to allow the district court to determine that those facts, if proved, demonstrate that the actions taken were not objectively reasonable in light of clearly established law.'" *Dill v. City of Edmond,* 155 F.3d 1193, 1204 (10th Cir.1998) (quoting *Breidenbach v. Bolish,* 126 F.3d 1288, 1293 (10th Cir.1997)). After defendants raise the qualified immunity defense, "[p]laintiff may amend [the] complaint to include additional 'specific, non-conclusory allegations of fact' sufficient to allow the district court to determine whether Defendants are entitled to qualified immunity." 155 F.3d at 1204 (quoting *Breidenbach* at 1293).[9]

---

9. After *Leatherman v. Tarrant County,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), one could argue that plaintiffs' complaint is not subject to a "heightened pleading requirement." *See Sapp v. Cunningham,* 847 F.Supp. 893, 900 n. 9 (D.Wyo.1994) (stating that *Leatherman* "effectively overrules this aspect of *Sawyer v. County of Creek,* 908 F.2d 663, 665–67 (10th Cir.1990), where the Tenth

Circuit endorsed a heightened pleading requirement."). *Leatherman,* however, specifically did not address whether its "qualified immunity jurisprudence would require a heightened pleading in cases involving individual government officials." 507 U.S. at 168, 113 S.Ct. 1160. Some have argued that in *Crawford–El v. Britton,* 523 U.S. 574, 118

In response to defendants' motion to dismiss in this case, plaintiffs have not amended their complaint or sought leave to do so. Should plaintiffs desire to amend the complaint, the Court will consider a motion to do so made within ten days of the filing of this order.

■■■■ In order to defeat defendants' claim of qualified immunity, plaintiffs must "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that that law was clearly established when the alleged violation occurred." *Pueblo Neighborhood Health Ctrs.*, 847· F.2d at 646; *see also Dixon v. Richer*, 922 F.2d 1456, 1460 (10th Cir.1991). If plaintiff meets this burden, the normal burden to dismiss shifts back to defendants. *See* 847 F.2d at 646. Ordinarily, in order for plaintiff to demonstrate that a law is clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir.1992); *see also Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (a right is clearly established if the contours of the right are "sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right"). Plaintiff "must do more than identify in the abstract a clearly established right and allege that the defendant has violated it." *Pueblo Neighborhood Health Centers*, 847 F.2d at 645. Plaintiff "must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity." *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir.1995) (quotation omitted); *see also Walter v.*

*Morton*, 33 F.3d 1240, 1242 (10th Cir.1994) (plaintiff has burden to show with particularity facts and law establishing inference that defendants violated constitutional right). "If the district court denies the defendant qualified immunity, the court should identify on the record the defendant's conduct that violated clearly established law." *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir.1996) (citing *Albright*, 51 F.3d at 1535).

"[T]he Supreme Court has recently stated that the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 516–17 (10th Cir.1998) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998)); *see also Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Thus, the Court follows the two-step test to analyze the issue of qualified immunity.

### a. Certain Individual Defendants

Plaintiffs do not allege any conduct whatsoever by many of the individual defendants, including Harold Walker, chief counsel for the Unified Government, Bond, Lupe Gonzalas, an employee with the Code Enforcement Department and James McDaniel, an inspector for the Wyandotte County Health Department. Plaintiffs specifically list Debbie Graber, the director of the Rental Licensing Department, as a defendant on their substantive due process and equal protection claims, but do not

---

S.Ct. 1584, 140 L.Ed.2d 759 (1998), the Supreme Court indicated that it would not require a heightened pleading standard in such a case. *See Judge v. City of Lowell*, 160 F.3d 67 (1st Cir.1998). But the actual holding of *Crawford–El* was that in an individual capacity suit against a government official, in which the official's improper motive is a necessary

element, a plaintiff need not adduce "clear and convincing evidence" of the motive to defeat a summary judgment motion. The Tenth Circuit has continued to apply a heightened standard of pleading, even after *Crawford–El*. This Court is therefore compelled to do likewise in this case.

allege that she was involved in any of the actions which form the bases for these claims. *See Amended Petition For Damages* (Doc. # 24) at 26–27. Plaintiffs bring every claim against "[t]he municipal defendants promulgating the unlawful policies," see *Amended Petition For Damages* (Doc. # 24), but the only defendant who allegedly created any policies according to the amended complaint is Marinovich, mayor/CEO of the Unified Government. *See id.* at 3.[10] The Court finds that plaintiffs' conclusory assertions against municipal defendants who promulgated unlawful policies state a claim only against Marinovich.[11]

Plaintiffs fail to allege any constitutional violation by Walker, Bond, Gonzalas, McDaniel and Graber because they fail to allege how these defendants violated plaintiffs' constitutional rights. *See Morris v. State of Kan. Dept. of Revenue,* 849 F.Supp. 1421, 1426 (D.Kan.1994) (citing *Codd v. Brown,* 949 F.2d 879, 882 (6th Cir.1991)); *see also Wise v. Bravo,* 666 F.2d 1328, 1333 (10th Cir.1981) ("Constitutional rights allegedly invaded, warranting an award of damages, must be specifically identified. Conclusory allegations will not suffice"). Plaintiffs must allege sufficient facts to establish that these defendants personally participated in the alleged violations. *See Jenkins v. Wood,* 81 F.3d 988, 994 (10th Cir.1996); *Bennett v. Passic,* 545 F.2d 1260, 1262–63 (10th Cir.1976). Plaintiffs' allegations fail to do so, and the Court finds that plaintiffs have failed to state a claim against Walker, Bond, Gonzalas, McDaniel and Graber. The Court therefore dismisses these individual defendants pursuant to Rule 12(b)(6).

### b. First Amendment Claims

 Plaintiffs allege that defendants violated their rights to protected expression and their First Amendment right not to be retaliated against. *Amended Petition For Damages,* (Doc. # 24) at 7. Plaintiffs' complaint does not include these allegations as part of any of their 29 claims, nor does it identify any factual bases for these allegations, such as identifying what protected expression plaintiffs made or which defendants retaliated against them. "[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Hall,* 935 F.2d at 1110. The Court therefore finds that to the extent plaintiffs intend to claim violations of their rights to protected expression and their right to freedom from retaliation, Rule 12(b)(6) entitles these defendants to dismissal. Likewise, plaintiffs cite no case law which shows that defendants' conduct violated clearly established rights to protected expression and against retaliation, and all individual defendants are entitled to qualified immunity on these theories. *See Tonkovich,* 159 F.3d at 530–31.

### c. Substantive Due Process

 Based on the entire course of conduct occurring after the search on July 11, plaintiffs also claim denial of substantive due process.[12] To be entitled to substan-

10. Plaintiffs state that Ray Bond, chief building inspector/administrator for the Building Inspections Department, and Ohler are "legally responsible for the . . . formation of departmental policy," but do not allege that they formulated any policy. *See id.* at 4.

11. Reading *plaintiffs' complaint liberally,* it alleges that every act taken by other individual defendants was pursuant to the policies set by Marinovich. Therefore, for purposes of the present motion to dismiss, whether or not Marinovich is entitled to qualified immunity hinges upon whether the individual actors who fulfilled her policies are entitled to qualified immunity.

12. Based on the allegations in the complaint and *Plaintiffs [sic] Response To Defendants' Motion To Dismiss Plaintiffs' Amended Petition For Damages And Memorandum In Opposition Of Defendants' Motion To Dismiss* (Doc. # 37), it appears that plaintiffs may actually intend to bring a procedural due process claim regarding this course of conduct. Plaintiffs, however, bear the burden of pleading the type of due process claim. *See Tonkovich,* 159 F.3d at 527 ("defendants should not be required to guess whether [plaintiff] pled a substantive due process claim, a procedural due process claim, or both"). In addition, the Court is not plaintiffs' advocate and will not construct arguments or theories for them. *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th

tive due process, plaintiffs must allege the deprivation of liberty or property. *See Tonkovich*, 159 F.3d at 527. Plaintiffs allege that after the warrant search on July 11, defendants deprived Watson of her building permit and rental license. Plaintiffs further allege that defendants told all tenants that they would have to vacate the properties. Plaintiffs do not allege that defendants forced any tenant to leave, however, and the complaint indeed alleges that at least some tenants lived at the properties when defendants executed the search warrant on October 8. Plaintiffs fail to identify any tenants who actually complied with any demand to vacate. Therefore, with the possible exception of Watson's property interest in her building permit and rental license, the complaint fails to identify any deprivation of liberty or property that plaintiffs suffered.

Even assuming that defendants deprived plaintiffs of a liberty or property interest, their substantive due process claim is subject to dismissal. If plaintiffs allege violation of a fundamental right, defendants' conduct is subject to strict scrutiny. *See Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). Plaintiffs' substantive due process claim wholly fails to identify any fundamental right that defendants denied. Plaintiffs have the burden to identify the rights allegedly violated. *Tonkovich*, 159 F.3d at 527; *Babbar v. Ebadi*, 36 F.Supp.2d 1269, 1282 (D.Kan. 1998). Elsewhere in the complaint, plaintiffs allege that defendants deprived them of their fundamental rights to privacy and to decide where to live. While the Supreme Court has discussed a general right to privacy, see *Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), it has not recognized a privacy

right of the type claimed here. The Supreme Court has found fundamental rights in "personal decisions relating to marriage, procreation, contraception, family relationships, child rearing and education." *Planned Parenthood v. Casey*, 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). "[T]he fundamental right of privacy protects citizens against governmental intrusion in such intimate family matters as procreation, childrearing, marriage, and contraceptive choice. These cases embody the principle that personal decisions that profoundly affect bodily integrity, identity, and destiny should be largely beyond the reach of government." *Id.* at 926–27, 112 S.Ct. 2791 (Blackmun, J. concurring/dissenting). Plaintiffs' complaint, even when read in the light most favorable to them, does not allege an invasion of a fundamental right to make profound personal decisions as protected by substantive due process.[13] The only decision which defendants invaded is plaintiffs' decision to act as they chose regarding their property. Plaintiffs fail to provide any case law which suggests that this decision is among "the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy." *Planned Parenthood*, 505 U.S. at 851, 112 S.Ct. 2791. The Court finds that plaintiffs have not alleged a violation of their right to privacy as set forth by Supreme Court precedent. Similarly, plaintiffs cite no case law which establishes a fundamental right to choose where they live, and the Court's research has disclosed no such fundamental right. *See generally Wimber v. Department of Social and Rehabilitation Services*, 1994 WL 192039 at *8 (D.Kan. April 13, 1994). Plaintiffs' sub-

---

Cir.1991). Because plaintiffs expressly title their claim as one for substantive due process, the Court construes it as such.

**13.** Even making all inferences in plaintiffs' favor, a fair reading of the complaint suggests that plaintiffs' invasion of privacy allegations are only concerned with the invasions of pri-

vate properties during unlawful searches. Substantive due process standards do not apply to these invasions; the Court must apply the Fourth Amendment to determine if defendants' searches were constitutional. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

stantive due process claims are not subject to strict scrutiny analysis.

The Court must therefore determine whether defendants' executive actions "would 'shock the conscience of federal judges.'" *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir.1995) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (further quotation omitted)). To satisfy this standard, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power"; indeed, plaintiff "must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* To meet this standard, plaintiffs must allege "a high level of outrageousness." *Id.* at 574. As the Tenth Circuit has stated,

> [i]n order to discern whether the facts of the instant case "shock the conscience" so as to rise to the level of a substantive due process violation, we must bear in mind three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety.

*Id.* at 573 (citations omitted). Keeping these considerations in mind, conduct most likely to shock the conscience is "conduct intended to injure in some way unjustifiable by any government interest." *County of Sacramento*, 118 S.Ct. at 1718. Even when viewed in the most favorable light possible, the allegations in plaintiffs' substantive due process claim hardly violate "the decencies of civilized conduct." *Id.* at 1716. Plaintiffs allege that defendants (1) dispatched a letter to Watson which listed several requirements and alleged code violations, most of which were false and the rest of which were minor and outside Watson's control; (2) directed Watson to hire an engineer and architect to give the city a report and plan on the buildings, even though a court had previously ruled that Watson did not need to do so; (3) revoked Watson's building permit on July 21, 1997 and delayed mailing the revocation letter until August 28, 1997; (4) tagged Watson's properties as unfit and notified tenants that they would have to leave; (5) terminated Watson's rental license for the properties even though she had paid her fees; and (6) failed to hold a hearing regarding the properties despite providing notice of a hearing date on September 8, 1997. Most importantly, plaintiffs' allegations do not suggest that defendants acted in a way unjustifiable by any legitimate government interest.

Defendants clearly have a legitimate government interest in closing down buildings which contain fire hazards. Even accepting plaintiffs' allegations as true, defendants acted to shut down properties and not out of any interest other than enforcing the fire code. In fact, plaintiffs notably do not dispute that some fire code violations existed. Plaintiffs' chief complaint is that defendants violated the law in enforcing the fire code. While defendants' conduct may have been unlawful in some respects, plaintiffs' allegations fail to allege tortious conduct which is conscience-shocking to federal judges. Plaintiffs cite no case law on the issue and the Court finds none that suggests a different outcome. Similarly, even if their allegations were conscience-shocking, plaintiffs wholly fail to meet their burden of showing that the conscience-shocking nature of defendants' actions was clearly established. *See Tonkovich*, 159 F.3d at 532 ("[p]ages and pages of facts are no substitute for citations to clearly established law. Nor can they meet [plaintiffs'] burden on qualified immunity"). Defendants are therefore entitled to dismissal of plaintiffs' substantive due process claim based on Rule 12(b)(6) and qualified immunity, because the claim fails to allege the deprivation of a clearly-established constitutional right.

#### d. Equal Protection

 Plaintiffs' equal protection claim is also flawed. When the government treats plaintiffs differently than it treats similarly situated individuals, it implicates plaintiffs' right to equal protection under the Fourteenth Amendment. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Unless plaintiffs allege a violation of a fundamental right or discrimination against a suspect class, however, defendants only need a rational justification for their actions. *Penrod v. Zavaras,* 94 F.3d 1399, 1406 (10th Cir.1996).

 Plaintiffs fail to plead the material elements of an equal protection claim. *See Hall,* 935 F.2d at 1110. "[A]t the heart of any equal protection claim must be an allegation of being treated differently than those similarly situated." *Tonkovich,* 159 F.3d at 533. Plaintiffs only allege how they have been treated; they do not compare themselves with other individuals and therefore make no attempt to show that they are similarly situated with anyone who has been treated differently. *See Keys Youth Services, Inc. v. City of Olathe,* 38 F.Supp.2d 914, 926 (D.Kan. 1999); *Green,* 47 F.Supp.2d at 1283. Plaintiffs also fail to show that the class of landlords and tenants has received differential treatment as a group. Other than making one conclusory statement that defendants display open bias against landlords and tenants, plaintiffs fail to allege that any other landlords and tenants suffered the same treatment as plaintiffs. In analyzing the sufficiency of plaintiffs' complaint, the court need accept as true only plaintiffs' well-pleaded factual contentions, not their conclusory allegations. *Hall,* 935 F.2d at 1110.

Last, even ignoring the other deficiencies, as discussed above, plaintiffs fail to identify a fundamental right. In addition, while plaintiffs allege that landlords and tenants are a protected class, they cite no case law to support this conclusion and in fact the law is otherwise. *See Taylor Inv., Ltd. v. Upper Darby Tp.,* 983 F.2d 1285, 1294 (3d Cir.1993) (property owners not suspect class); *Kraebel v. New York City Dept. of Housing Preservation and Development,* 959 F.2d 395, 402 (2d Cir.1992) (landlords not suspect class); *Schnuck v. City of Santa Monica,* 935 F.2d 171, 176 (9th Cir.1991) (same). Likewise, plaintiffs do not allege the lack of a rational basis for the differential treatment. The Court finds that plaintiffs' equal protection claim must be dismissed for failure to state a claim under Rule 12(b)(6). In addition, as with their substantive due process claim, plaintiffs completely fail to meet their burden of providing any authority showing that defendants violated equal protection rights that were clearly established at the time. *See Tonkovich,* 159 F.3d at 530–31. The individual defendants are therefore entitled to qualified immunity as well. The Court therefore dismisses plaintiffs' equal protection claim.

#### e. Invasion of Privacy

Plaintiffs also allege that defendants invaded their constitutional right to privacy, as provided by the First, Fourth and Fourteenth Amendments. As the Court discussed above, the complaint fails to allege a constitutional deprivation of plaintiffs' fundamental right to privacy. In addition, plaintiffs provide absolutely no authority that recognizes a constitutional claim for invasion of privacy independent of a substantive due process or equal protection claim. Plaintiffs' complaint fails to state a deprivation of their constitutional right to privacy as required by Rule 12(b)(6) and even if it did, plaintiffs again fail to meet their burden of showing that defendants' conduct violated this right in a way that was clearly established. The Court therefore dismisses plaintiffs' constitutional invasion of privacy claim based on both failure to state a claim under Rule 12(b)(6) and qualified immunity.

#### f. Procedural Due Process

 Defendants are also entitled to dismissal of plaintiffs' procedural due pro-

cess claims both for failure to state a claim under Rule 12(b)(6) and on the basis of qualified immunity. Plaintiffs' complaint alleges that defendants violated due process in obtaining and executing the search warrants of July 11 and October 9.[14] As with their substantive due process claims, plaintiffs must first show a deprivation of liberty or property. *See Tonkovich,* 159 F.3d at 517. Regarding the search on July 11, plaintiffs allege that defendants seized the properties for three hours while conducting the search, forced entry into sealed basement areas, and broke a window to gain entry to one apartment. Plaintiffs fail to allege, however, that defendants' actions deprived any plaintiff of a liberty or property interest. First, plaintiffs fail to allege who suffered the broken window and whether the injured tenant is a plaintiff in this case. Plaintiffs therefore fail to show that defendants deprived any of them of a property interest when defendants broke the window. Second, deprivations that are no more than de minimis do not rise to the level of constitutional violations; plaintiffs must allege the deprivation of a significant property or liberty interest. *See Conn v. Gabbert,* 526 U.S. 286, 119 S.Ct. 1292, 1296, 143 L.Ed.2d 399 (1999); *Fuentes v. Shevin,* 407 U.S. 67, 86, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Dill v. City of Edmond,* 155 F.3d 1193 (10th Cir.1998); *Wise v. Bravo,* 666 F.2d 1328, 1333 (10th Cir.1981). In the Court's view, temporarily seizing control over the properties while conducting the search and entering a sealed basement are not the type of significant deprivations of property which give rise to procedural due process claims. The search itself constituted no more than a brief interruption of plaintiffs' property rights. Plaintiffs do not allege any property damage which resulted from the entry into the sealed basement area. In sum, plaintiffs fail to allege the depriva-tion of any significant property or liberty interest during the search on July 11.

■ Likewise, plaintiffs do not allege the deprivation of any significant property or liberty interest during the search on October 9. Plaintiffs allege that defendants handcuffed Steve Perry and placed him in a police car, broke the main lock at 1215 Central, and damaged items in storage. While defendants did allegedly seize Steve Perry, the complaint shows nothing more than a brief detention. The complaint suggests that Christie Perry quickly gave defendants the keys to the properties when she saw her husband under arrest. Once she gave them the keys, defendants released Steve Perry. And while they gave him a ticket, defendants apparently dropped any charges against Steve Perry. In short, even if the seizure was improper, it was so brief as to be no more than a de minimis deprivation of Steve Perry's liberty. *See Fillmore v. Eichkorn,* 891 F.Supp. 1482, 1493 (D.Kan.1995); *Doe v. Bagan,* 41 F.3d 571, 575 (10th Cir.1994).

■ Plaintiffs also fail to allege a deprivation of property when defendants damaged items in storage. As above, plaintiffs do not allege who owned the property and they therefore fail to allege that defendants deprived any particular plaintiff of his or her property. Further, plaintiffs do not allege that defendants destroyed any item or that any damage was more than de minimis. In addition, the complaint does not state who owned the lock which defendants allegedly broke. Even if the Court assumes that Watson owned the lock because she owned the main properties, the Court finds that the breaking of Watson's lock is a de minimis injury for purposes of procedural due process.

14. Notably, plaintiffs' procedural due process claims do not allege that defendants violated due process in obtaining the warrant or in their actions after the warrant; they expressly limit the claims to execution of the search warrant. While the complaint does not specify whether plaintiffs intend to bring a proce-dural due process or a substantive due process claim, the Court construes the claim as a procedural due process claim because *Graham,* 490 U.S. at 395, 109 S.Ct. 1865, clearly bars a substantive due process claim which challenges defendants' conduct in obtaining and executing a search warrant.

Even if plaintiffs had alleged a sufficient deprivation, plaintiffs are otherwise unable to allege a procedural due process claim. Plaintiffs' claim is based solely on obtaining and executing the search warrant; plaintiffs do not allege that defendants lacked adequate postdeprivation procedures for compensating plaintiffs for any deprivation of property or allege that they even attempted such a recovery. *See Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Walden v. Carmack,* 156 F.3d 861, 874 (8th Cir.1998). Plaintiffs must therefore allege facts showing that predeprivation process was required and was inadequate. Plaintiffs fail on both counts. First, predeprivation process was not required before defendants broke the window, entered the basement, broke the lock, or damaged property. The United States Supreme Court has noted that

> an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.

*Hudson,* 468 U.S. at 533, 104 S.Ct. 3194. Plaintiffs do not allege that the government authorized defendants to take any of these specific actions. While plaintiffs make a broad, conclusory allegation that defendants' course of conduct occurred under set municipal policies, this allegation is too conclusory to permit a reasonable inference that the government policies were so specific as to expressly direct employees to break windows and enter sealed basements during a search or to break locks and damage items during a search. *See*

*Tonkovich,* 159 F.3d at 533. Plaintiffs do not allege the existence of a specific policy that would cover these isolated sets of circumstances; they allege random acts by government employees in the execution of warrants under general municipal policies.[15] *See Parratt v. Taylor,* 451 U.S. 527, 541, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Defendants therefore did not need to provide notice and a hearing before they took the challenged actions.

Second, to the extent that plaintiffs contend predeprivation process was inadequate, the Court finds that plaintiffs are limited to their Fourth Amendment claim. As the Supreme Court has noted, "the Fourth Amendment applies to searches and seizures in the civil context and may serve to resolve the legality of these governmental actions without reference to other constitutional provisions." *United States v. James Daniel Good Real Property,* 510 U.S. 43, 51, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993). This case differs from those where the government seizes property pursuant to a warrant and then exercises dominion or control over the property. *See id.* Here, plaintiffs only challenge the actions which defendants took in obtaining and executing the search warrant and arresting Steve Perry. If defendants complied with the Fourth Amendment when obtaining and executing the warrant and arresting Steve Perry, they satisfied any predeprivation due process requirements as well. *Pino v. Higgs,* 75 F.3d 1461, 1469 (10th Cir.1996) ("procedural due process affords Appellant no more protection than her right to be free from unreasonable seizure"); *Gehl Group v. Koby,* 63 F.3d 1528, 1539 (10th Cir. 1995); *Sanders v. City of San Diego,* 93 F.3d 1423, 1428–29 (9th Cir.1996); *Robinson v. Clemons,* 987 F.Supp. 280, 285 (D.Del.1998). Because plaintiffs bring a Fourth Amendment claim based on the

---

**15.** In their response, plaintiffs clarify that the municipal policy in question was basically a code of silence to ignore all bad acts of municipal employees in enforcing the code. *See Plaintiffs [sic] Response To Defendants' Mo-* *tion To Dismiss Plaintiffs' Amended Petition For Damages And Memorandum In Opposition Of Defendants' Motion To Dismiss* (Doc. # 37) at 19.

very same alleged conduct, the Court dismisses plaintiffs' procedural due process claims. For the various reasons stated above, defendants are entitled to dismissal of plaintiff's procedural due process claim under Rule 12(b)(6).

Even if the Court had found that plaintiffs adequately alleged a violation of their constitutional right to procedural due process, they fail to meet their burden of showing that defendants violated clearly established law. *See Tonkovich,* 159 F.3d at 530–31. In arguing against qualified immunity, plaintiffs do not cite a single case which establishes that defendants' conduct violated clearly established procedural due process rights. The Court therefore dismisses plaintiffs' claim on the basis of qualified immunity as well.

### g. Fourth Amendment

Finally, defendants argue that they are entitled to qualified immunity on plaintiffs' Fourth Amendment claims. Plaintiffs allege that defendants conducted unreasonable warrantless searches on July 10 and 11, 1997. Plaintiffs allege that during the first search, defendants entered the outside of plaintiffs' properties without consent, probable cause or exigent circumstances. Plaintiffs had marked the properties with "no trespassing" signs. Again on July 11, defendants entered the curtilage of the Central Avenue properties. Defendants opened the gate and entered the property of Steve and Christine Perry even though it also had a "no trespassing" sign.

The Court finds that Steve and Christine Perry have adequately alleged a constitutional violation in the July 11 search, but that the other plaintiffs have failed to meet their burden. Because defendants have asserted their qualified immunity, plaintiffs' complaint must contain " 'specific, non-conclusory allegations of fact sufficient to allow the district court to determine that those facts, if proved, demonstrate that the actions taken were not objectively reasonable in light of clearly established law.' " *Dill,* 155 F.3d at 1204

(quoting *Breidenbach,* 126 F.3d at 1293). Plaintiffs must "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that that law was clearly established when the alleged violation occurred." *Pueblo Neighborhood Health Ctrs.,* 847 F.2d at 646. While the Fourth Amendment protects curtilage from warrantless searches, "what comprises curtilage is a question of fact." *United States v. Swepston,* 987 F.2d 1510, 1513 (10th Cir.1993). "To determine whether an area falls within the home's ·curtilage, we consider four factors: (1) the proximity of the area to the home; (2) inclusion of the area within an enclosure surrounding the home; (3) the nature of the uses of the area; and (4) steps taken by the resident to protect the area from observation by persons passing by." *United States v. Long,* 176 F.3d 1304, 1308 (10th Cir.1999). Here, only the Perrys have alleged specific facts that are sufficient to show that defendants invaded an area where plaintiffs had a reasonable expectation of privacy without a warrant. While the other plaintiffs allege that defendants invaded their curtilage, they provide virtually no factual support for this conclusory allegation. *See Hall,* 935 F.2d at 1110. The only factual allegation which supports any of the four factors is that the Central Avenue properties all had "no trespassing" signs. While this is a step taken to protect plaintiffs' expectation of privacy, it alone is insufficient to find that defendants invaded the curtilage of the properties. *See Oliver v. United States,* 466 U.S. 170, 179, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); *United States v. Sumner,* 793 F.Supp. 273, 275 (D.Kan.1992). Plaintiffs provide no facts regarding how close to the properties defendants went, whether the properties were within an enclosure, or whether the area was truly private or was used commonly by plaintiffs' guests. While the Court can infer that defendants probably came close to the buildings because of the nature of their search—code violations in the buildings— plaintiffs fail to allege facts which show

that defendants entered areas which were not commonly used by the public or plaintiffs' visitors, where plaintiffs had a reasonable expectation of privacy. Given the multi-resident nature of these properties, plaintiffs generally had less of an expectation of privacy in common areas. *See* Wayne R. LaFave, *Search & Seizure*, (3rd ed.) § 2.3(f) at 509–510; *United States v. Ludwig*, 10 F.3d 1523, 1526 (10th Cir.1993) (no reasonable expectation of privacy in motel parking lot); *State v. Berry*, 223 Kan. 102, 106, 573 P.2d 584, 587 (1977) (motel resident had no reasonable expectation of privacy in area surrounding motel). Even if plaintiffs had alleged sufficient facts to infer that defendants invaded the curtilage of these properties, plaintiffs provide no case law which clearly establishes this outcome. As mentioned, the nature of rental properties creates a gray area regarding what constitutes curtilage, making it difficult for plaintiffs to establish that defendants knew or should have known that their entry onto the properties violated the Fourth Amendment.

■ On the other hand, Steve and Christine Perry provide allegations which suggest that only they occupied their property. Given the nature of city lots, the Court can infer that the area which defendants entered defendants was close to the Perry home, especially because defendants videotaped their home after entering the property. The area was apparently surrounded by an enclosure, because defendants entered the property through a gate. Steve Perry alleges that he used part of the area as his tomato garden, suggesting that the area was not open to public entry. Lastly, Steve Perry had placed a "no trespassing" sign on the property. Combining all of these factors in plaintiffs' favor, the Court concludes that Steve and Christine Perry have sufficiently alleged that they had a reasonable expectation of privacy in the area which defendants entered. These plaintiffs have therefore alleged a constitu-

tional violation of their Fourth Amendment rights.[16]

Likewise, the Court finds that defendants knew or should have known that they were entering the curtilage of the property without a warrant. The Supreme Court and Tenth Circuit have clearly established that plaintiffs have a reasonable expectation of privacy in the curtilage of their homes and have clearly established the relevant factors in determining whether plaintiffs had a reasonable expectation of privacy in the area defendants invaded. *See United States v. Dunn*, 480 U.S. 294, 300–01, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); *Long*, 176 F.3d at 1308; *Swepston*, 987 F.2d at 1513. Tenth Circuit and Kansas cases both focus heavily on the proximity of the area to the house and especially on whether the area was enclosed. *See United States v. Swepston*, 987 F.2d 1510, 1514 (10th Cir.1993) (chicken shed inside fence and close to house within curtilage); *United States v. Carra*, 604 F.2d 1271, 1273 (10th Cir.1979) (garden within fence considered curtilage); *State v. Waldschmidt*, 12 Kan.App.2d 284, 290, 740 P.2d 617, 622, review denied (1987) (fenced yard considered curtilage); *State v. Mitchell*, 8 Kan.App.2d 265, 268, 655 P.2d 140, 142–43 (Kan.App.1982) (enclosed area requiring access through gate considered curtilage). Steve and Christine Perry also showed an expectation of privacy through the placement of the "no trespassing" sign. *See United States v. Long*, 176 F.3d 1304, 1308 (10th Cir.1999) (individual must have reasonable expectation of privacy in area). Based on plaintiffs' allegations, the area which defendants invaded was within the curtilage of the Perry house. The Court finds that plaintiffs' Fourth Amendment right is clearly established and that plaintiffs have sufficiently alleged that defendants violated this right during their warrantless search on July 11.

16. The Court recognizes that Watson owned the property which Steve and Christine Perry occupied, but Watson fails to establish that she had a reasonable expectation of privacy in the property, especially considering that plaintiffs' allegations suggest that Steve and Christine Perry were the only residents of this property.

 Plaintiffs also have sufficiently alleged Fourth Amendment violations concerning the searches on July 11 and October 9. "[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Municipal Court*, 387 U.S. 523, 528–529, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). To obtain a warrant for an administrative search, government officials can show probable cause for the warrant "based not only on specific evidence of an existing violation but also on a showing that 'reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment].' " *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 321–22, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (quoting *Camara*, 387 U.S. at 538, 87 S.Ct. 1727).

 Plaintiffs allege that the warrants were not valid for two reasons. First, plaintiffs allege that defendants sought the warrant based on specific evidence which was false. Plaintiffs further allege that defendants obtained a warrant which allowed them to search every apartment without any evidence that the apartments had violations. Obtaining a warrant on intentionally false testimony is a violation of the Fourth Amendment. *See Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Likewise, plaintiffs allege that even if defendants' testimony was not false, the resulting warrant was too general to be valid because it exceeded the specific evidence which defendants had obtained. The Tenth Circuit has expressly noted that

> when the warrant application is grounded not upon conformance with administrative or legislative guidelines but upon "specific evidence" of violations . . . there must be some plausible basis for believing that a violation is likely to be found. The facts offered must be sufficient to warrant further investigation or testing.

*Marshall v. Horn Seed Co., Inc.*, 647 F.2d 96, 102 (10th Cir.1981). Reading the complaint in the light most favorable to plaintiffs, it shows no plausible basis for believing that a code violation was likely to be found in any specific apartment. Plaintiffs allege that defendants never entered the buildings and therefore did not have evidence of specific violations in specific apartments. Plaintiffs further allege that defendants did not list any specific code violations or link any violations to any specific apartment.

Plaintiffs also allege that while *Camara* allows defendants to obtain a warrant pursuant to reasonable administrative standards governing inspections, defendants did not rely on any set standards. Plaintiffs allege that defendants did not act pursuant to a neutral inspection plan, see *Donovan v. Hackney, Inc.*, 769 F.2d 650, 653 (10th Cir.1985), but specifically targeted plaintiffs' properties. In addition, plaintiffs allege that defendants did not comply with applicable standards because municipal ordinances require defendants to obtain a refusal of entry before defendants can obtain a search warrant. Plaintiffs allege that defendants did not obtain a refusal of entry from tenants of the properties, yet the warrant was so broad that defendants used it to search every apartment. While Watson and Steve Perry refused to let defendants enter the common areas of the properties, the law establishes that they did not have the power to grant or refuse entry into occupied apartments. *See Camara*, 387 U.S. at 540, 87 S.Ct. 1727 (citing *Stoner v. State of California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948)). Plaintiffs therefore allege that defendants did not have valid search warrants when they conducted the searches on July 11 and October 9.

 Plaintiffs further allege that even if the warrants were valid, defendants conducted unreasonable searches pursuant to the warrants. Even assuming that the warrants properly allowed defendants to

search the entire properties, the Fourth Amendment requires defendants to conduct the search in a reasonable manner and only to take that action which is reasonably necessary to execute the warrant. *United States v. Ramirez,* 523 U.S. 65, 118 S.Ct. 992, 996, 140 L.Ed.2d 191 (1998) ("[t]he general touchstone of reasonableness which governs Fourth Amendment analysis ... governs the method of execution of the warrant"); *Lawmaster v. Ward,* 125 F.3d 1341, 1351 n. 4 (10th Cir. 1997). During the search on July 11, defendants forced entry into sealed basement areas and broke a window to gain entry into an occupied apartment. During the October 9 search, defendants broke the main lock on 1215 Central Avenue and damaged items in storage. While one might assume that defendants had no other way to get into the sealed basement and locked apartment, the Court cannot make such an assumption. Making all inferences in plaintiffs' favor, the complaint contains no indication that any of these actions were reasonably necessary to the successful execution of the search warrant. Plaintiffs therefore have sufficiently alleged that defendants conducted unreasonable searches on July 11 and October 9.[17]

 The Court further finds that plaintiffs' Fourth Amendment rights were clearly established when defendants obtained the allegedly invalid warrants and conducted the allegedly unreasonable searches. Since at least 1967, *Camara* has clearly established that government officials must obtain a warrant based on either specific evidence of code violations or reasonable standards for inspection. According to plaintiffs, defendants falsely testified that they had specific evidence of code violations in all apartments. Intentionally providing false testimony to obtain a warrant violates plaintiffs' clearly established Fourth Amendment rights. *See United States v. Green,* 175 F.3d 822, 828 (10th Cir.1999); *Clanton v. Cooper,* 129

F.3d 1147, 1154 (10th Cir.1997). In addition, it has been clearly established since at least 1981 that a search warrant based on specific evidence of code violations cannot be overbroad. *Marshall,* 647 F.2d at 102. Because Ohler and Rust not only executed the warrants, but also helped obtain them, these defendants could not reasonably rely on the validity of the warrants. Likewise, plaintiffs' allegations allow a reasonable inference that all defendants who were involved in obtaining and executing the warrants were aware that the warrants were invalid. Further, at the time of the searches, case law clearly established that defendants can only take those actions which are reasonably necessary to execute a warrant. *See Dalia v. United States,* 441 U.S. 238, 258, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979) (manner in which warrant executed subject to judicial review for reasonableness); *see also Lawmaster,* 125 F.3d at 1351 (citing *Bills v. Aseltine,* 958 F.2d 697, 704 (6th Cir.1992); *Hill v. McIntyre,* 884 F.2d 271, 277 (6th Cir.1989); *Tarpley v. Greene,* 684 F.2d 1, 8–9 (D.C.Cir.1982); *Duncan v. Barnes,* 592 F.2d 1336, 1338 (5th Cir.1979)). Even if defendants could reasonably rely on the validity of the warrants, they must execute the warrant properly. *See Dalia,* 441 U.S. at 258, 99 S.Ct. 1682; *United States v. Rowland,* 145 F.3d 1194, 1208 n. 10 (10th Cir.1998) (good-faith exception will not save improperly executed warrant). Viewing the allegations in the most favorable light to plaintiffs, the Court finds that plaintiffs (1) have stated violations of their Fourth Amendment rights and (2) have shown that these rights are so clearly established that defendants are not entitled to qualified immunity on the Fourth Amendment claims.

### 3. Immunity Under the Kansas Tort Claims Act

 Defendants argue that plaintiffs' state law tort claims are barred because

---

**17.** The Court finds, however, that the Fourth Amendment does not reach plaintiffs' allegation that defendants refused to let Steve Perry read the warrant. Perry cites no case law,

and the Court finds no case law which provides a Fourth Amendment right to read a warrant before it is executed.

defendants' conduct falls within exceptions to the waiver of sovereign immunity provided by the Kansas Tort Claims Act, K.S.A. § 75–6101 *et seq.* ("KTCA").[18] The KTCA makes governmental entities and their employees liable for a "negligent or wrongful act or omission." K.S.A. § 75–6103(a). The KTCA includes various exceptions to liability, but immunity is the exception and liability is the rule. *Fettke v. City of Wichita,* 264 Kan. 629, 633, 957 P.2d 409, 412 (1998). Plaintiffs bring state tort claims for trespass, outrage, invasion of privacy, invasion of privacy by false light, tortious interference with existing contracts, tortious interference with prospective business advantage, false arrest, conspiracy and abuse of process. Plaintiffs' claims involve intentional torts and allege willful and malicious conduct by defendants; they do not sound in negligence. The Kansas Supreme Court has recently reiterated the narrow scope of immunity under the KTCA:

> The exceptions to liability of a governmental entity or employee set out in 75–6104 are not without limitations. Only negligent or wrongful acts or omissions of employees are excepted from liability by 75–6104, while acts or omissions involving more than the lack of ordinary care and diligence are not.

*Moran v. State,* 267 Kan. 583, 985 P.2d 127 (1999) (quoting *Hopkins v. State,* 237 Kan. 601, 611, 702 P.2d 311 (1985)). "[S]ection 75–6104 exceptions to liability only protect negligent conduct, but not willful or wanton acts by governmental employees." *Burgess v. West,* 817 F.Supp. 1520, 1526 (D.Kan.1993). In other words, government officials have the right to err in performing their job, but not to act in bad faith. *Beck v. Kansas Adult Authority,* 241 Kan. 13, 19, 735 P.2d 222, 228 (1987). Plaintiffs allege that defendants acted willfully and maliciously. Taking plaintiffs' allegations of willful conduct as true, defendants are not entitled to immunity under the exceptions contained in the KTCA.[19]

■ In addition, none of the cited exceptions provide defendants immunity. Defendants argue that Section 75–6104(k) protects their searches of plaintiffs' property because the searches are inadequate inspections. As another court in this district has recently stated,

> The thrust of subsection (k) is to protect governmental entities and employees from injuries that occur on property that was unsafe and had not been properly inspected by the housing authorities. The very language of this section shows that it provides immunity for "the failure to make an inspection, or making an inadequate or negligent inspection." The plaintiffs are not alleging injuries arising out of a failure to make an inspection or the making of an inadequate

---

18. The KTCA provides several pertinent exceptions in K.S.A. Section 75–6104:

A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from: ***
(c) enforcement of or failure to enforce a law, whether valid or invalid, including, but not limited to, any statute, rule and regulation, ordinance or resolution; ***
(e) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved; ***
(k) the failure to make an inspection, or making an inadequate or negligent inspec-

tion, of any property other than the property of the governmental entity, to determine whether the property complies with or violates any law or rule and regulation or contains a hazard to public health or safety; ***
(n) failure to provide, or the method of providing, police or fire protection....

19. The Court recognizes that defendants may later be entitled to immunity under the KTCA if plaintiffs are unable to provide evidence of willful or malicious conduct by defendants. *See Green v. City of Wichita,* 47 F.Supp.2d 1273, 1278 (D.Kan.1999) (finding KTCA immunity on motion for summary judgment when plaintiffs failed to meet burden of proof).

inspection. Rather, they are claiming that the inspections which took place, and the resulting citations, were improper. Kan.Stat.Ann. § 75–6104(k) does not provide immunity to the defendants in this case.

*Green v. City of Wichita,* 47 F.Supp.2d 1273, 1276 (D.Kan.1999). In addition, many of plaintiffs' claims involve conduct that extends beyond property inspection. For instance, plaintiffs' abuse of process claim challenges defendants' entire course of conduct, including setting municipal policies, conducting the inspections, and revoking Watson's license and repair permit. Other than the inspections, defendants actions are clearly outside the provisions of Section 75–6104(k).

Defendants next argue that Section 75–6104(n) provides immunity because plaintiffs challenge defendants' method of police and fire protection. Section 75–6104(n) does not provide immunity, however, based on plaintiffs' allegations. First, this exception does not cover intentional torts by police officers. *See Caplinger v. Carter,* 9 Kan.App.2d 287, 295, 676 P.2d 1300, *rev. denied,* 235 Kan. 1041 (1984). Second, while this exception can be read broadly to cover virtually every act by police and fire departments, the Kansas Supreme Court has not granted such broad immunity. Rather, it has held that this provision

is aimed at such basic matters as the type and number of fire trucks and police cars considered necessary for the operation of the respective departments; how many personnel might be required; how many and where police cars are to operate; the placement and supply of fire hydrants; and the selection of equipment options. Accordingly, a city is immunized from such claims as a burglary could have been prevented if additional police cars had been on patrol, or a house could have been saved if more or better fire equipment had been purchased. We do not believe [this provision] is so broad as to immunize a city on every aspect of negligent police and fire department operations. Should

firemen negligently go to the wrong house and chop a hole in the roof thereof, we do not believe the city has immunity therefor on the basis the negligent act was a part of the method of fire protection.

*Jackson v. City of Kansas City,* 235 Kan. 278, 292, 680 P.2d 877, 890 (1984). Plaintiffs' claims allege specific decisions to target plaintiffs and close down plaintiffs' properties; they do not seek to impose liability on the basis of general and broad operational decisions.

Defendants also argue that Section 75–6104(c) protects them because they were enforcing municipal housing, building and fire ordinances when they committed the torts which plaintiffs allege. To be entitled to protection under Section 75–6104(c), however, defendants' conduct must fall within the purview of these ordinances. *Lantz v. City of Lawrence,* 232 Kan. 492, 497, 657 P.2d 539, 543 (1983). Defendants are not entitled to immunity when plaintiffs allege additional acts or omissions outside the scope of the laws being enforced. The Kansas Supreme Court has so held:

We construe [Section] 75–6104(c) to provide an exemption from claimed liability only where claimant's sole asserted claim of causal negligence is the public entity's enforcement or failure to enforce a law. That section does not provide an exemption where the agency, in enforcing or failing to enforce a law, commits some additional tortious act or omission which would be negligence at common law, and which act or omission causes damage.

*Cansler v. State,* 234 Kan. 554, 558, 675 P.2d 57 (1984); *see Lindenman v. Umscheid,* 255 Kan. 610, 636, 875 P.2d 964, 981 (1994); *Collins v. Heavener Properties, Inc.,* 245 Kan. 623, 632, 783 P.2d 883 (1989). The record before the Court on defendants' pending motion to dismiss does not include the ordinances which defendants allegedly violated. The Court therefore cannot say that defendants' conduct was wholly within the ordinances.

The Court must accept plaintiffs' allegations as true, and it doubts that the ordinances allow tortious conduct such as trespass and intentional infliction of emotional distress. In addition, while one could argue that defendants were acting pursuant to illegal policies which apparently condoned their tortious activity, defendants were not enforcing these policies when they acted; they were enforcing the municipal ordinances. Section 75–6104(n) does not provide immunity to defendants.

Finally, defendants argue that the discretionary function exception of Section 75–6104(e) provides immunity. The Court disagrees. First, plaintiffs' allegations, when viewed in the light most favorable to plaintiffs, show that the defendants who went to the properties were acting in accordance with illegal policies. Therefore, according to plaintiffs' complaint, the actions of these defendants were not discretionary; defendants' illegal policies directed the actors to commit the alleged torts. *See Nero v. Kansas State Univ.,* 253 Kan. 567, 585, 861 P.2d 768, 781 (1993) (where mandatory duty or guideline is clearly defined, discretionary function exception not applicable). In addition, plaintiffs allege that defendants violated municipal ordinances which required defendants to obtain a refusal of entry from someone in control of the property before they could obtain a search warrant. Again, assuming the truth of plaintiffs' allegations, defendants' searches based upon the warrants therefore violated mandatory guidelines and do not qualify as discretionary. *See Kansas State Bank & Trust Co. v. Specialized Transportation Servs., Inc.,* 249 Kan.

348, 366, 819 P.2d 587, 600 (1991) (failure to follow mandatory guidelines not within KTCA discretionary function exception). Most importantly, as noted above, while the creation of the illegal policies may have been discretionary, defendants did not have discretion to willfully commit torts as alleged in plaintiffs' complaint. *See Moran,* 267 Kan. 583, 985 P.2d 127; *Lindenman,* 255 Kan. at 639, 875 P.2d at 982 (government does not have discretion to maliciously prosecute). Based on plaintiffs' complaint, defendants are not covered by the discretionary function exception.[20]

**IT IS THEREFORE ORDERED** that *Defendants' Motion To Dismiss Plaintiffs' Amended Petition For Damages* (Doc. # 29) filed July 1, 1999 be and hereby is **SUSTAINED** in part and **DENIED** in part. The Court dismisses all claims against Harold Walker, Ray Bond, Lupe Gonzalas, James McDaniel, and Debbie Graber for failure to state a claim under Rule 12(b)(6). The Court dismisses all claims for violation of plaintiffs' rights to protected expression and freedom from retaliation on both Rule 12(b)(6) and qualified immunity grounds. Further, as to the search of July 10, 1997, the Court dismisses the Fourth Amendment claim by Sandra Watson, William Bushue, Steve Perry, Carla Balzer, Christy Knight and Ronald Beachman against Carol Marinovich (for creating the policies), Pat Ohler and all defendants who entered the properties (Count 3).[21] These claims are dismissed for failure to state a claim for relief under Rule 12(b)(6) and because the individual defendants are entitled to qualified immu-

---

**20.** The Court again notes that defendants are not precluded from raising the KTCA immunity issue once the record is further established. For example, if the evidence shows that defendants arrested Steve Perry in conformance with guidelines for arrest, defendants would be entitled to immunity for his false arrest claim. *See Burgess,* 817 F.Supp. at 1525 n. 4 (citing *Fudge v. City of Kansas City,* 239 Kan. 369, 374–75, 720 P.2d 1093, 1099–1100 (1986)).

**21.** Defendants only seek dismissal of the federal constitutional claims under 42 U.S.C.

§ 1983. Defendants do seek dismissal of plaintiffs' state constitutional claims. Even though many if not all of the state constitutional claims are governed by the same standards as the federal constitutional claims, the Court does not address the propriety of the state claims—including the threshold issue of whether plaintiffs can even bring a claim for damages based on violation of the Kansas Constitution. In addition, the Court reiterates that the Unified Government remains a defendant in this case because defendants' motion is brought on behalf of the individual defendants.

nity. The Court also dismisses the Fourth Amendment claim by Sandra Watson, William Bushue, Carla Balzer, Christy Knight and Ronald Beachman against Carol Marinovich, Pat Ohler, Edwin A. Rust, Debbie Ward and all other defendants who entered the properties during the warrantless search of July 11, 1997. The Court dismisses this claim for failure to state a claim under Rule 12(b)(6) and on qualified immunity grounds (Count 7).[22]

The Court dismisses the federal due process (Count 15) and invasion of privacy (Count 13) claims by Sandra Watson, William Bushue, Steve Perry, Carla Balzer, Christy Knight and Ronald Beachman against Carol Marinovich, Edwin A. Rust, Maurice Ryan, Gregory Talkin, Wayne Bradley and Debbie Ward and all others involved in obtaining and executing the search of July 11, 1997 under the warrant, for failure to state a claim under Rule 12(b)(6) and based on qualified immunity.[23]

The Court dismisses the federal claims for denial of substantive due process and equal protection (Count 18) by Sandra Watson, William Bushue, Steve Perry, Carla Balzer, Christy Knight and Ronald Beachman against Carol Marinovich, John Lacy, Debbie Graber, Gregory Talkin, Pat Ohler, Edwin A. Rust and all others involved in the eviction, revocation of building permit and rental license, and lack of a hearing for failure to state a claim under Rule 12(b)(6) and on the basis of qualified immunity.[24]

The Court dismisses the federal claim by Sandra Watson, William Bushue, Steve Perry, Carla Balzer, Christy Knight, Christy Anthony and Dora Huff against Carol Marinovich, Edwin A. Rust, Pat Ohler, Gregory Talkin, Wayne Bradley and all others involved in obtaining and executing the search of October 9, 1997 under the warrant for deprivation of due process (Count 25).[25]

**IT IS FURTHER ORDERED** that plaintiffs show cause in writing on or before **November 19, 1999,** why the Court should not (1) dismiss the state law constitutional claims to the extent it has dismissed their federal counterparts and (2) dismiss the claims against the municipal defendants which it has dismissed against the individual defendants on Rule 12(b)(6) grounds.

Plaintiffs' state law tort claims remain in their entirety.

---

22. Count 7 remains, however, regarding the Fourth Amendment claim by Steve and Christine Perry against Carol Marinovich, Pat Ohler, Edwin A. Rust, Debbie Ward and all other defendants who entered the properties.

23. Count 13 also alleges a state law tort claim for invasion of privacy. To that extent, Count 13 remains. Likewise, Count 15 also alleges a state law due process claim which currently remains.

24. Count 18 also alleges substantive due process and equal protection under the Kansas Constitution. These claims remain.

25. Count 25 remains to the extent it alleges a deprivation of due process under the Kansas Constitution.